*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SAVE OUR CUMBERLAND MOUNTAINS,
APPALACHIAN VOICES, THE SIERRA CLUB and
SOUTHERN APPALACHIAN BIODIVERSITY PROJECT,
　　　　　　　　　　　*Plaintiffs-Appellants,*

　　　　*v.*

DIRK KEMPTHORNE, Secretary of the United States
Department of the Interior, in his official capacity;
JEFFREY JARRETT, Director of the United States
Office of Surface Mining Reclamation and
Enforcement, in his official capacity; and TIM
DIERINGER, Director of the Knoxville Field Office
of Surface Mining Reclamation and Enforcement, in
his official capacity,
　　　　　　　　　　*Defendants-Appellees,*

NATIONAL COAL CORPORATION,
　　　　　　　*Intervenor-Defendant-Appellee.*

No. 05-5663

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 03-00462—Thomas Varlan, District Judge.

Argued: March 6, 2006

Decided and Filed: June 29, 2006

Before: SUTTON and GRIFFIN, Circuit Judges; OBERDORFER, District Judge.[*]

---

## COUNSEL

**ARGUED:** Scott A. Gollwitzer, APPALACHIAN VOICES, Asheville, North Carolina, for Appellants. Suzanne H. Bauknight, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, Garry K. Grooms, STITES & HARBISON, Nashville, Tennessee, for Appellees. **ON BRIEF:** Scott A. Gollwitzer, APPALACHIAN VOICES, Asheville, North Carolina, Stephen

---

[*] The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

A. Sanders, APPALACHIAN CITIZENS LAW CENTER, Prestonsburg, Kentucky, Mary M. Mastin, PADDOCK & MASTIN, Cookeville, Tennessee, for Appellants. Suzanne H. Bauknight, Pamela Steele, ASSISTANT UNITED STATES ATTORNEYS, Knoxville, Tennessee, Garry K. Grooms, STITES & HARBISON, Nashville, Tennessee, Charles P. Gault, UNITED STATES DEPARTMENT OF INTERIOR, Knoxville, Tennessee, for Appellees.

---

## OPINION

---

SUTTON, Circuit Judge. Four environmental groups filed this action contending that the Office of Surface Mining and Reclamation, an office of the Department of the Interior, abused its discretion (1) in conducting an environmental assessment of an application by the National Coal Corporation to mine roughly 1,100 acres in the Cumberland River watershed of northeastern Tennessee and (2) in issuing a finding of no significant environmental impact with respect to the application. Among other things, plaintiffs argued that the agency's environmental assessment did not take a sufficiently "hard look" at the consequences of the application, *see Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures*, 422 U.S. 289, 322 (1975), as mandated by the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (codified as amended at 42 U.S.C. § 4321 *et seq.*), and that the agency arbitrarily concluded that the proposed mining would have no significant impact on the region's environment. The extensive record compiled by the agency, the many modifications made to the mining application by the coal company in response to concerns raised by the agency and the minimal long-term effects of the mining proposal on the environment all convinced the district court that the agency did not abuse its discretion.

While we affirm, we express one caveat in doing so. Throughout the environmental-assessment process and throughout this litigation, the Office of Surface Mining has taken the position that it need only consider three alternatives to the mining application—grant the license, deny the license or take no action. That approach, in our view, unduly circumscribes the scope of alternatives that the statute and regulations require federal agencies to consider. Nonetheless, because the administrative record shows that the agency in effect did consider other options to the coal company's license request (primarily modifications to the application that would diminish the environmental consequences of the mining) and because plaintiffs on appeal have not identified any concrete alternatives that the agency should have considered (but did not), we affirm.

I.

On June 28, 2002, the National Coal Corporation applied to the Office of Surface Mining for a permit to "conduct contour cross-ridge[] and auger coal mining operations on Zeb Mountain in Campbell and Scott Counties, Tennessee." D. Ct. Op. at 2. Commonly known as strip mining, cross-ridge mining removes surrounding rock with explosives to expose a seam of coal, which permits miners to excavate the coal with heavy mining equipment (and often with the use of additional explosives). Once a mining company has removed the surrounding rock, it also can remove the coal through auger mining, which accesses the coal with a large drill.

The coal company sought a permit to mine and build support structures on 1,148.7 acres of a 2,107 acre area. According to its application, the mining project would last about ten years and in the end would return all but a small portion of the affected land to its natural contours, including 412 acres of previously mined, unreclaimed land. Consistent with the requirements of the Surface Mining Control and Reclamation Act of 1977, Pub. L. No. 95-87, 91 Stat. 447 (codified as amended at 30 U.S.C. § 1201 *et seq.*), the coal company published its application in the local newspapers. And consistent with the Act, the Office of Surface Mining, which administers the Act on behalf of

the Department of the Interior, solicited comments from "various federal, state[] and local governmental agencies and environmental organizations" about the application. D. Ct. Op. at 3. The United States Fish and Wildlife Service, the Tennessee Wildlife Resources Agency, the Division of Natural Heritage of the Tennessee Department of the Environment and Conservation, one of the plaintiffs and several other environmental organizations provided comments. The agency also held an informal conference about the application on October 17, 2002, which attracted 13 registered speakers and prompted 19 letters from interested parties.

As a result of this discourse and as a result of its own inquiry, the Office of Surface Mining issued seven notices of deficiency to the coal company. In response, the company revised and republished its proposed mining plan several times, making changes that affected nearly all areas of interest under the National Environmental Policy Act, including providing (1) greater protection for various animal species threatened by the mining, (2) improved contingencies for the treatment of potentially contaminated water, (3) a revised drainage-control plan, (4) a revised topsoil-handling plan, (5) improved land-reclamation standards, (6) a revised revegetation plan that included the use of hardwood trees, (7) a plan to reestablish the habitats of certain at-risk species and (8) a plan to protect local residents from the noise and dust caused by blasting.

The agency also conducted an environmental assessment of the plan, which examined the effects of the proposed mining on topography, geology, soils, vegetation, land use, aesthetics, hydrology, fish and wildlife, cultural and historic resources, air quality and socioeconomics. On June 30, 2003, the agency published this environmental assessment as well as a finding of no significant impact, and—upon the posting by the coal company of a $3.8 million bond designed to ensure that it meets its reclamation responsibilities—issued a permit for the company to begin mining.

On September 4, 2003, four environmental groups—Save Our Cumberland Mountains, Appalachian Voices, the Sierra Club and the Southern Appalachian Biodiversity Project—filed this lawsuit. They moved for a preliminary injunction, arguing that the federal agency had failed to comply with the National Environmental Policy Act because it drafted an incomplete environmental assessment and arbitrarily issued a finding of no significant impact. The district court denied the requested injunction on October 31, 2003, after which it granted the motion of the coal company to intervene as a defendant in the case. On February 23, 2005, the court granted the agency's motion for summary judgment, concluding that plaintiffs had failed to show that the agency's environmental assessment and its decision to issue a finding of no significant impact were "arbitrary, capricious or [abuses] of discretion." D. Ct. Op. at 21.

II.

Congress enacted the National Environmental Policy Act "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment [and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man . . . ." 42 U.S.C. § 4321. To the ends of advancing this purpose, § 102 of the Act mandates that "all agencies of the Federal Government shall . . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment[] a detailed statement by the responsible official on"—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

As suggested by the requirements of this "detailed statement"—what the regulations refer to as an "environmental impact statement," 40 C.F.R. § 1502.1—the Act serves procedural rather than substantive goals. It does not require agencies to "achieve particular substantive environmental results," *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989), but requires them to "collect and disseminate information about the environmental consequences of proposed actions that fall under their respective jurisdictions," *Sw. Williamson County Cmty. Ass'n v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001); *cf. Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1273–74 (10th Cir. 2004) (contrasting the "substantive restrictions" of the Clean Water Act with the "procedural requirements" of the National Environmental Protection Act). The upshot of the Act is to "integrate[]" "environmental concerns . . . into the very process of agency decisionmaking." *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989) (noting that the Act focuses "the agency's attention on the environmental consequences of a proposed project," "guarantees that the relevant information will be made available to the larger audience that may also play a role" in the agency's decision, and ensures that other affected governmental bodies will have "adequate notice of the expected consequences and the opportunity to plan and implement corrective measures in a timely manner").

In integrating environmental considerations into agency deliberations, § 102 requires an affected federal agency (here the Office of Surface Mining) to prepare an environmental impact statement whenever two things are true: (1) there has been a "proposal[] for legislation and other major Federal actions," and (2) the proposal would "significantly affect[] the quality of the human environment." No one questions that "major Federal action[]" exists here, as the Office of Surface Mining has responsibility under the Surface Mining Control and Reclamation Act for approving applications to mine coal in this country. 30 U.S.C. § 1211(c); *see* 40 C.F.R. § 1508.18 (noting that major federal actions "include[] actions . . . potentially subject to Federal control and responsibility"); *id*. § 1508.18(a) (referring to such actions as ones that may be "assisted, conducted, regulated, or approved by federal agencies"); *id*. § 1508.18(b)(4); *see generally Slater*, 243 F.3d at 278–79 (holding that a major federal action need not be funded by federal money).

The point of debate is whether this mining proposal would "significantly affect[] the quality of the human environment." In providing guidance to agencies about when they should prepare an environmental impact statement, the implementing regulations, promulgated by the Council on Environmental Quality, say that the agency should ask whether the proposal is one that "[n]ormally requires an environmental impact statement," 40 C.F.R. § 1501.4(a)(1), or "[n]ormally does not require" such a statement, *id.* § 1501.4(a)(2). When, as in this case, the agency determines that it is not clear whether the license application requires an environmental impact statement, the regulations direct the agency preliminarily to prepare an "environmental assessment." *Id.* § 1501.4(b).

An environmental assessment

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

*Id*. § 1508.9. If after preparing an environmental assessment the agency determines that the project will have no significant environmental consequences, it need not issue an environmental impact statement and instead may issue a finding of no significant impact—"a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13; *see Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (noting that an agency should decide "whether and to what extent to prepare an [environmental impact statement] based on the usefulness of any new potential information to the decisionmaking process").

When faced with a lawsuit under the National Environmental Policy Act, a federal court has authority to review the agency's action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. We review an agency's environmental assessment, and its decision that an environmental impact statement need not be prepared, under the deferential "arbitrary and capricious" standard. *Id*. § 706(2)(A); *Pub. Citizen*, 541 U.S. at 763 (requiring federal courts to ensure that the agency's finding of no significant impact was not "arbitrary and capricious"); *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995). In deciding whether the agency acted arbitrarily, "[w]e will not 'substitute our judgment of the environmental impact for the judgment of the agency,'" but we will insist that "'the agency has, in fact, adequately studied the issue and taken a "hard look" at the environmental consequences of its decision.'" *Kelley*, 42 F.3d at 1518–19 (quoting *Crounse Corp. v. Interstate Commerce Comm'n*, 781 F.2d 1176, 1193 (6th Cir. 1986)).

At 40 pages in length, the environmental assessment satisfies most of these regulatory requirements. It contains a brief discussion of the need for the proposed decision, and it discusses at length the environmental effects of the proposed action, including its impact on topography, geology, soils, vegetation, land use, hydrology, fish and wildlife, threatened and endangered species, cultural and historic resources, air quality, aesthetics, socioeconomics, public safety and environmental justice.

In considering the environmental consequences of the plan, the agency consulted numerous studies of similar mining operations in other Appalachian mountain regions. *See, e.g.*, JA 531 (referencing a report on soil redevelopment in a West Virginia coal mine site in 2001); JA 532 (referencing a 2002 Tennessee Valley Authority draft environmental assessment for nearby Braden Mountain concerning measures to ease the reintroduction of wildlife to the mining site); JA 534 (referencing a 1981 report regarding reclaimed mines on nearby Brushy and Walnut Mountains and concluding that post-mining reclamation will minimize any impact on wildlife); *id*. (referencing a 2001 study indicating that mining causes greater disturbances to salamander populations than clearcutting); JA 540 (referencing a West Virginia University study concluding that emissions from similar mining operations posed little health risk); JA 541 (referencing a previous Office of Surface Mining environmental impact statement to establish the likely impact area of wind-blown dust); *id*.

(using an environmental study on surface mining to determine the likely effect of air-quality changes on residents); JA 545–46 (using an Office of Surface Mining environmental impact statement to determine the likely threat to local residents from blasting operations). The agency also consulted studies assessing the specific effects of this mining operation. *See, e.g.*, JA 535 (referencing the cumulative hydrological impact assessments performed by the Office of Surface Mining to evaluate the effects of the proposed mining on area water supplies). And, finally, the agency considered the 1985 environmental impact statement that it had completed in approving Tennessee's plan for overseeing surface coal mining operations and reclaiming abandoned mining areas under the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1235, 1253. *See, e.g.*, JA 541–42.

The report acknowledges that the mining will have several short-term effects: the disruption of "(1) land use, (2) wildlife/wildlife habitat, (3) aquatic species/habitats, (4) air quality, (5) soils, (6) postmining vegetation cover, and (7) aesthetics." JA 517. But it explains that the plan's reclamation and mitigation efforts will diminish, if not entirely remediate, most of these problems over the long run. *See, e.g.*, JA 534–35 (noting that although mining initially will drive certain animal species out of the area, "the large amounts of similar habitat adjacent to the project area" mean that the impact on "terrestrial wildlife in the region would be temporary and [is] unlikely to have adverse impacts on the wildlife population as a whole in [the] area," and "the subsequent incremental reclamation of the disturbed areas would reduce impacts to local populations of wildlife"); JA 531 ("[I]n the short term, disturbance to soils will be complete but mitigated to a large extent by the salvaging and redistribution of soil growth medium . . . . [Studies] confirm[] that development of soils and soil profiles more similar to the native soils is likely to occur over a period of years following completion of mining."); JA 531–32 (noting that much of the local vegetation will be removed during mining but thereafter will be replaced with native vegetation, restoring an area substantially diminished by previous mining and logging).

When it comes to the near-term effects of the mining application, the agency's assessment shows that it took a "hard look" at the consequences of its decision and did not act arbitrarily in making a finding of no significant impact. So long as mining involves the initial destruction of the earth's surface, it will have some near-term effect on the environment. The critical question is what the company proposes to do about it. The company in this instance responded to initial concerns that the agency raised about the application, proposed measures to mitigate the near-term damage to the environment and proposed measures designed to restore the environment to its pre-mining state. In addition to raising these concerns, the agency thoroughly examined the application and the environmental consequences of granting the license. Under these circumstances, the agency did what the law required it to do (with one exception discussed below), and its decision that the effects of the mining would not be significant lay well within its discretion. *See Sierra Club v. Slater*, 120 F.3d 623, 635 (6th Cir. 1997) (concluding that the agency's determination that temporary impacts are not significant was not arbitrary and capricious); *see also Akiak Native Cmty. v. United States Postal Serv.*, 213 F.3d 1140, 1147 (9th Cir. 2000) (concluding that evidence that an impact was only short-term meant that its impact was not significant); *River Rd. Alliance, Inc. v. Corps of Eng'rs of United States Army*, 764 F.2d 445, 451 (7th Cir. 1985) (concluding that the temporary nature of the harmful effects at issue, among other considerations, rendered them insignificant).

Long-term impacts from a mining operation are another matter, though they do not invariably doom a mining proposal or, as here, compel the issuance of an environmental impact statement. In its report, the agency acknowledged four long-term consequences of the proposed mining operation: "(1) alterations of topography, (2) additional alteration of the geologic strata, (3) increased infiltration rates through the backfilled material, and (4) permanent retention of roads and sediment basins." JA 530. The "proper implementation of the proposed operation and reclamation plan," it concluded, would "prevent or minimize the adverse effects that may occur from the permanent changes." *Id*. The agency's conclusion is not unreasonable. The permanent changes to topography, for example, consist of the initial removal of 250 to 350 feet from the tops of three knobs on a ridge

in the proposed mining area that ultimately will be replaced with backfill. When coal companies previously mined this ridge, they left knobs or "highwalls," which is to say the unreclaimed remnants of earlier mining operations. The agency concluded that the replacement of the highwalls with backfill would not have a significant environmental impact because the current topography consists of the remnants of past mining and of soil contaminated by that mining and the backfill would more nearly return the ridge to its original, pre-mining contour. The agency further concluded that the plan adequately mitigated the other long-term effects of the operation and that in the end they would be minimal. *See* JA 530–31 (noting that backfill would help to shore up the disturbed geological strata); JA 533 (noting that despite increased water flow through backfill materials, "the proposed operation has been designed to prevent material damage to the hydrologic balance outside the permit area"); JA 544 (noting that despite retention of mining roads and sediment basins, "[w]hen the mining and reclamation is complete, the overall aesthetic quality of the area will generally be improved by the elimination of much of the [previously] abandoned mine impacts").

Relying on its environmental assessment, the agency issued a finding of no significant impact, explaining that the consequences of the mining are "predicted to be minor to moderate in the short-term while long-term impacts should be minimal." JA 514–15. Reasoning that post-mining reclamation would ameliorate most of the consequences of the mining and that the residual effects would be minor, the agency concluded that the permit "would not have a long-term major impact on the quality of the human environment. Therefore, an environmental impact statement pursuant to § 102(2)(c) of the National Environmental Policy Act is not required." JA 514. In view of the agency's generally thorough environmental assessment (again, with one exception noted below), in view of the considerable changes made to the coal company's proposal during the review process, in view of the company's proposal to improve a previously unreclaimed mining site, in view of the environmental assessment's incorporation of a prior environmental impact statement regarding coal mining in the region and that statement's detailed discussion of the general effects of mining in the area and in view of the record-based support for its determination, the agency's decision to issue a finding of no significant impact was neither arbitrary nor capricious.

Plaintiffs challenge these conclusions on three grounds: (1) the agency prepared a deficient environmental assessment because it failed to consider sufficient alternatives to the proposal; (2) the agency acted arbitrarily and capriciously in issuing a finding of no significant impact instead of requiring an environmental impact statement; and (3) the agency should have made the environmental assessment available for public comment 30 days before its final decision.

*First*, plaintiffs point out that the agency considered just three alternatives in preparing the environmental assessment—grant the license, deny the license or take "no action." In failing to consider other alternatives, plaintiffs claim, the agency breached the regulatory requirement that an environmental assessment contain a "brief discussion[] of . . . alternatives . . . [and] the environmental impacts of [those] . . . alternatives." 40 C.F.R. § 1508.9.

As a general matter, "the range of alternatives that must be discussed" under the National Environmental Policy Act "is a matter within an agency's discretion." *Friends of Ompompanoosuc v. Fed. Energy Regulatory Comm'n*, 968 F.2d 1549, 1558 (2d Cir. 1992); *see also Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551–52 (1978); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195–96 (D.C. Cir. 1991). In exercising that discretion, the agency should consider the purpose of the project, *see Citizens Against Burlington, Inc.*, 938 F.2d at 195, and the environmental consequences of the project.

As to the latter consideration, an agency has fewer reasons to consider alternatives when it prepares an environmental assessment as opposed to when it prepares an environmental impact statement. For in permissibly preparing an environmental assessment alone, the agency has

determined that the proposed project will have minimal environmental consequences, and accordingly its duty to consider environment-friendly alternatives is less pressing than when it issues an environmental impact statement. *See Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); *Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. Fed. Energy Regulatory Comm'n*, 143 F.3d 165, 172 (4th Cir. 1998); *North Carolina v. Fed. Aviation Admin.*, 957 F.2d 1125, 1134 (4th Cir. 1992). And when an agency permissibly identifies few if any environmental consequences of a project, it correspondingly has fewer reasons to consider environmentally sensitive alternatives to the project—what some courts have referred to as a "sliding-scale" approach to the issue. *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003); *Cent. S.D. Coop. Grazing Dist. v. Sec'y of the United States Dep't of Agric.*, 266 F.3d 889, 897 (8th Cir. 2001); *River Rd. Alliance, Inc. v. Corps of Eng'rs of the United States Army*, 764 F.2d 445, 452 (7th Cir. 1985). "[A]lthough consideration of some range of alternatives is essential to any environmental assessment, it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway." *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994).

In this instance, the agency concluded that the Surface Mining Control and Reclamation Act and accompanying regulations gave it just three options in reviewing the proposed action of a private party on private property—take no action, grant the license or deny the license. It considered and rejected the no-action alternative because it concluded that this option fell outside of its legislative authority. As it understood the federal program for Tennessee under the Surface Mining Act, the program did not give it authority to decline to act on the application. *See* Gov't Br. at 23 ("[The Office of Surface Mining] listed the only alternatives available when a federal agency is reviewing the proposed action of a private party" to mine privately owned land.). It considered and rejected the denial-of-the-license option as an inferior course of action. *See* JA 553 (noting that the temporary and permanent changes that the mining would cause would be prevented but "[d]isapproval would also result in the loss of employment opportunities associated with this mine site as well as the loss of revenue to the local economy and county tax base"). And it picked the preferred alternative—granting the license.

We do not disagree with the agency's inclusion of these three options in its assessment, and we do not disagree with its assessment of each option. But the suggestion that the agency had authority only to mention these three alternatives in its environmental assessment presents a false trichotomy. Whatever duties the Surface Mining Control and Reclamation Act imposes on the Office of Surface Mining, it does not suspend the agency's independent obligations under the National Environmental Policy Act. To the contrary, in enacting the Surface Mining Control Act, Congress disclaimed any interest in modifying the National Environmental Policy Act. *See* 30 U.S.C. § 1292(a) ("Nothing in this Act shall be construed as superseding, amending, modifying, or repealing the . . . National Environmental Policy Act of 1969 (42 U.S.C. §§ 4321–47) . . . ."); 30 U.S.C. § 1292(b) ("Nothing in this chapter shall affect in any way the authority of the Secretary [of the Department of the Interior] . . . under other provisions of law to include in any . . . permit . . . such conditions as may be appropriate to regulate surface coal mining and reclamation operations . . . ."). While the one statute (the Mining Act) may well channel and control the agency's authority to grant a mining license, *see* 30 U.S.C. § 1211(c), the other statute (the Environmental Act) independently requires federal agencies to study, evaluate and discuss alternatives to the proposed mining plan, *see* 42 U.S.C. § 4332(2) ("The Congress authorizes and directs that, to the fullest extent possible . . . all agencies of the federal government shall . . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . alternatives to the proposed action."); 40 C.F.R. § 1508.9 ("Environmental assessment shall include brief discussions . . . of alternatives as required by [42 U.S.C. § 4332(2)].").

Nor, at any rate, has the agency demonstrated that the Mining Act pulls it in one direction while the Environmental Act pulls it in another when it comes to the review of this mining application. In claiming it has authority under the Mining Act only to grant or deny a license, the agency cites four provisions—30 U.S.C. §§ 1211(c) & 1202; 30 C.F.R. §§ 773.7 & 773.15. But these provisions do not support the agency's position. Section 1211(c)(1) gives the Secretary a long list of "duties" (not restrictions), which include authority to "order the suspension, revocation, or withholding of any permit for failure to comply with any of the provisions of this Act" or regulations. Why this provision prohibits the agency from identifying (and discussing) alternatives to a mining application remains unclear, particularly since another part of this same subsection says that the Secretary may "perform such other duties as may be provided by law and relate to the purposes of this Act." 30 U.S.C. § 1211(c)(13).

Even less clear is why the "Statement of purpose" of the Act, 30 U.S.C. § 1202, prohibits the agency from considering other alternatives in an environmental assessment. That provision includes the following in its 13 statutory purposes: "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations," "assure that surface coal mining operations are so conducted as to protect the environment," "assure that adequate procedures are undertaken to reclaim surface areas as contemporaneously as possible with the surface coal mining operations," "strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy" and "wherever necessary, exercise the full reach of Federal constitutional powers to insure the protection of the public interest through effective control of surface coal mining operations." *Id.* None of the other stated purposes of the Act restricts an agency in identifying alternatives to a mining application, and the requirement that an environmental assessment identify (and discuss) environmentally sound alternatives to an application hardly disrespects the Act's special concerns related to preserving and protecting the environment.

Still more puzzling is the agency's invocation of 30 C.F.R. § 773.7(a). It says that the "regulatory authority shall review the application[,] . . . written comments and objections submitted[,] [ ] records of any . . . hearing held on the application and issue a written decision, within a reasonable time set by the regulatory authority, either granting, *requiring modification of*, or denying the application." (emphasis added). That the agency may "require[] modification of" the application of course presents the quintessential alternative to granting or denying the application, and consistent with the National Environmental Protection Act it would permit the agency to identify alternatives that are more environmentally considerate than the application's proposed course of action. The final regulation cited by the agency, 30 C.F.R. § 773.15, adds little, as it merely identifies the requirements for approving a permit application.

In the face of these provisions, we are hard pressed to understand the agency's insistence that an environmental assessment in this area (and presumably an environmental impact statement as well) may consider only three alternatives—approval, disapproval or no action. Surely one alternative that could have been discussed was a modification to the proposal—whether to the size of the area being mined, to the types of mining being contemplated or to the mitigation measures for the mining operation. That the agency previously identified several deficiencies in the application and that the coal company modified the application in response to this notice of deficiencies does not change matters. If the company has satisfied the agency that it has adopted appropriate mitigation measures, that permits the agency to explain in the environmental assessment that while a further modification to the application is an alternative, it no longer is a necessary alternative or, as sometimes will be the case, it is not a feasible alternative. The point is, modification remains an alternative—one that disproves the agency's claim that it has no *authority* to consider other alternatives. Nor is there anything in the Mining Act or regulations that the agency has called to our attention that prohibits the agency from a similar alternative—granting the application with conditions.

Whether in the context of environmental assessments or environmental impact statements, other courts have been skeptical of this kind of agency solipsism—that the agency's licensing responsibility gives it authority only to say "yes" or "no" to permit applications, making these the only alternatives the agency must discuss. As these courts correctly have recognized, the National Environmental Policy Act prevents federal agencies from effectively reducing the discussion of environmentally sound alternatives to a binary choice between granting or denying an application. *See Davis v. Mineta*, 302 F.3d 1104, 1122 (10th Cir. 2002) ("[O]nly two alternatives were studied in detail: the no build alternative, and the preferred alternative. [The agency] acted arbitrarily and capriciously in approving an [environmental assessment] that does not provide an adequate discussion of [p]roject alternatives."); *see also Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999) ("[T]he National Environmental Policy Act and Council on Environmental Quality Regulations require [an agency] to study in detail all 'reasonable' alternatives [in an environmental impact statement]. . . . [Courts] have interpreted this requirement to preclude agencies from defining the objectives of their actions in terms so unreasonably narrow they can be accomplished by only one alternative."); *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 666–67 (7th Cir. 1997) ("One obvious way for an agency to slip past the strictures of [the National Environmental Policy Act] is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence). The federal courts cannot condone an agency's frustration of Congressional will. If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the [environmental impact statement] cannot fulfill its role."); *cf.* 40 C.F.R. § 1500-6 ("Each agency shall interpret the provisions of the [National Environmental Policy Act] as a supplement to its existing authority and as a mandate to view traditional policies and missions in the light of the Act's national environmental objectives.").

Nor does *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), support the agency's position that it may redefine the "alternatives" discussion in an environmental assessment or an environmental impact statement to the all-or-nothing-at-all option of granting or denying the permit. It concerned a matter not in dispute here—whether a "[m]ajor Federal action" had occurred sufficient to prompt the agency to prepare an environmental impact statement. *Id.* at 763–64. "What is not properly before us," the Court disclaimed, "is any challenge to the [environmental assessment] due to its failure properly to consider possible alternatives to the proposed action (i.e., the issuance of the challenged rules) that would mitigate the environmental impact of the authorization of cross-border operations by Mexican motor carriers." *Id.* at 764. In any event, even if *Public Citizen* and its discussion of agency authority governed the "alternatives" requirement, we have explained why the agency had authority to require the coal company to *modify* its proposal. *See* 30 C.F.R. § 773.7(a) ("[R]egulatory authority shall review the application[,] . . . written comments and objections submitted [and] records of any . . . hearing held on the application and issue a written decision, within a reasonable time set by the regulatory authority, either granting, *requiring modification of*, or denying the application.") (emphasis added).

To be clear, our objection to the agency's position is a discrete, and readily correctable, one: The agency holds to the view that it effectively may not discuss or consider any alternatives other than granting or denying an application in an environmental assessment (and presumably an environmental impact statement), and that position cannot be reconciled with the Surface Mining and Reclamation Act, the National Environmental Policy Act or the regulations promulgated under either Act. We appreciate that the agency has ample discretion to determine the number of alternatives it will identify and discuss; but it cannot adopt the across-the-board position that its discretion will never exceed two alternatives (in truth, one alternative, as two options give the agency just one alternative). We appreciate that an environmental assessment concluding that a proposed action will have minimal consequences for the environment will diminish the number of alternatives that the agency should identify and consider; but this reality does not confine the agency to considering only whether to deny or grant the license, an agency "alternative" that it did not take passage of the National Environmental Policy Act to establish.

And we appreciate that the agency may apply a "rule of reason" in this area and discuss only "reasonable" alternatives to the proposed action. *See Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 551. So, for example, the agency had no duty to discuss energy conservation as an alternative to the coal company's license application—as the Surface Mining Act itself encourages such mining while striking a balance between the economic, energy and employment advantages of coal mining on the one hand with the environmental hazards of coal mining on the other. *See id.* at 552 (rejecting "energy conservation" as a reasonable alternative to the proposal to license a nuclear plant because "[t]o make an impact statement something more than an exercise in frivolous boilerplate[,] the concept of alternatives must be bounded by some notion of feasibility"); *Cent. S. D. Coop.*, 266 F.3d at 897 ("An agency need not consider all policy alternatives in its decision-making. Nor must an agency pursue policy alternatives that are contrary to the pertinent statutory goals or do not fulfill a project's purpose."); *Citizens Against Burlington, Inc.*, 938 F.2d at 195. But this accepted limitation on the agency's duty does not give it a free hand to set aside anything other than granting or denying an application as an unreasonable alternative. "In contrast to a policy alternative generally"—say, energy conservation in the context of a surface mining application—"an alternative within the ambit of an existing standard"—say, a different scope of operation or additional mitigation measures—generally "may not be abandoned without any consideration whatsoever." *Cent. S. D. Coop.*, 266 F.3d at 898 (internal quotation marks and brackets omitted).

While we cannot accept the agency's interpretation of its duty to discuss alternatives in an environmental assessment, we are not prepared to invalidate this environmental assessment as "arbitrary and capricious." Rules are rules, it is assuredly true. And one would customarily hesitate to find harmless a procedural flaw in a procedurally driven statute. As the Tenth Circuit reasoned: "In mandating compliance with [the National Environmental Policy Act's] procedural requirements as a means of safeguarding against environmental harms, Congress has presumptively determined that the failure to comply with [the Act] has detrimental consequences for the environment." *Davis*, 302 F.3d at 1114; *see Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989).

But plaintiffs have not shown that this error had any chance (or still has any chance) of altering the agency's deliberations or conclusions. *Cf. Davis*, 302 F.3d at 1115 (requiring plaintiffs in the context of a preliminary-injunction action to show that "their specific environmental interests" were injured by violation of the Act). On appeal plaintiffs have not identified a single alternative that the agency should have considered but did not. *See Greater Yellowstone Coal.*, 359 F.3d at 1277 (stressing the importance of "record evidence suggesting two viable alternative[s]" as demonstrating agency error); *cf. Pub. Citizen*, 541 U.S. at 764 ("None of the respondents identified in their comments any rulemaking alternatives beyond those evaluated in the [environmental assessment], and none urged [the agency] to consider alternatives.").

Moreover, while the agency did not identify additional alternatives in so many words in the environmental assessment, it plainly considered alternatives during the administrative process. Among other things, the agency issued seven notices of deficiency to the coal company, and each of these deficiencies prompted the coal company to modify the plan with additional mitigation measures. *See* JA 57 ("All comments and concerns received by [the agency] during this integrated review process were evaluated and required [the coal company] to modify the permit application to mitigate predicted impacts to the extent practicable."). In the environmental assessment itself, a section addressing the impact of the plan on threatened and endangered species has an extended discussion of some of the mitigation measures that were adopted and the benefits of this modification over the original licensing proposal. *See* JA 536 (discussing measures adopted during the review process to ease the effect of the plan on the Indiana bat and the blackside dace).

Also mitigating the agency's error is the fact that in 1985 the agency completed a programmatic environmental impact statement, reviewing the state program under the Surface Mining Control and Reclamation Act for all of Tennessee. That document not only reviewed four

decisional alternatives (no decision, deny, grant or grant with conditions), but it also discussed alternatives in terms of the type of mining to be authorized and the yields to be allowed, among other mining variables. The agency issued its environmental assessment in the context of this prior statement and in many instances incorporated it. *See, e.g.*, JA 146–50 (discussing pros and cons of underground coal mining, area mining, contour mining, mountaintop removal and augering); JA 151 (comparing methods of on-site coal processing).

Having rejected the agency's self-imposed limitation on its authority to discuss alternatives under the National Environmental Policy Act, we see no sensible point under these unusual circumstances in going one step further—invalidating the otherwise-compliant environmental assessment and prolonging this litigation, particularly with respect to a project that has already been underway for two years. When it comes to environmental impact statements (and, to a lesser degree, environmental assessments), the Act identifies two purposes: (1) to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and (2) to "guarantee[] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349. The problem with this assessment was one of form, not function. The agency in effect did consider alternatives and the assessment identified considerable other information that normally would fall under the heading of "alternatives." While we remain reluctant to excuse procedural violations of a procedural statute, this is one of those rare instances in which it is appropriate. *Cf. Greater Yellowstone Coal.*, 359 F.3d at 1277–78 (noting that because "by the time the Corps' [environmental assessment] was prepared, Canyon Club and the Corps had seriously considered various alternatives," the court had less concern about the paucity of alternatives discussed in that document); *Friends of the Ompompanoosuc*, 968 F.2d at 1558 (noting in the context of the National Environmental Policy Act that "[b]ecause Vermont cannot demonstrate prejudice from [the Federal Energy Regulatory Commission's] oversight, reversal is not appropriate on this ground"); *Burkholder v. Peters*, No. 02-3394, 58 Fed. App'x 94, 98 (6th Cir. Jan. 9, 2003) ("This test is also consistent with our prior jurisprudence in [National Environmental Policy Act] cases, which has recognized a harmless-error rule . . . such that a mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination.") (internal quotation marks omitted).

*Second*, plaintiffs argue that the agency's finding of no significant impact was arbitrary and capricious for several independent reasons. Noting that the pertinent Department of Interior Manual, part 516, chapter 13, states that an environmental impact statement should be prepared for "mountaintop removal operations," Plaintiff's Br. at 18, they argue that such a statement is required here because the coal company's "cross-ridge mountaintop" mining operation fits within the definition of mountaintop removal found in 30 C.F.R. § 785.14(b), *id.* at 19. Not so. Such mining occurs, the definition says, when the company "remov[es] substantially all of the overburden off the bench and creat[es] a level plateau or a gently rolling contour, with no highwalls remaining . . . ." 30 C.F.R. § 785.14(b). As the agency explained during the administrative process, the coal company's "proposed operation does not include mountaintop removal mining" because "[t]he operation proposes to surface mine three mountain peaks or knobs that have been previously mined and were not returned to their approximate original contour. The existing highwalls are proposed to be eliminated and the three mountain peaks or knobs will be backfilled to their approximate original contour." JA 365. In other words, the current topography of the ridge is man-made—looking the way it does because earlier miners failed to return the ridge to its original state—and the company's application says that it will remove the highwalls and return the ridge to its pre-mining contour.

One reason that the Department of the Interior's manual might require an environmental impact statement in the context of mountaintop removal is because such removal necessarily causes a significant impact to the topography of the area. But when the company plans to restore the

topography and indeed more accurately return the topography to its pre-mining contours, as is the case here, these concerns dissipate.  The Surface Mining Control and Reclamation Act requires an applicant to return the land to its approximate original contour, *see* 30 U.S.C. § 1265(b)(3), and the coal company may be excused from that obligation only by obtaining an exception from the Office of Surface Mining, *see* 30 C.F.R. § 785.14(c).  No exception having been sought, the Act requires the coal company to restore the mountain, which is why there will not be a mountaintop "removal" and why the company will not have "creat[ed] a level plateau or a gently rolling contour" in place of the mountain.  30 C.F.R. § 785.14(b).  As shown by its actions in this case, the Office of Surface Mining does not generally issue an environmental impact statement for mountaintop mines where the company proposes to return the contours of the site to its pre-mining state.  *See* JA 152–53 (Office of Surface Mining, Handbook on Procedures for Implementing the National Environmental Policy Act).  The agency thus did not deviate from its standard procedure in issuing a finding of no significant impact in this case, and it did not otherwise act arbitrarily or capriciously in issuing a finding of no significant impact.

Plaintiffs next argue that the finding-of-no-significant-impact document itself is deficient because "it fails to detail any reasons why the mining operations will not significantly affect the environment."  Plaintiffs' Br. at 24.  The pertinent regulation says that the finding is a document "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.  It shall include the environmental assessment or a summary of it and . . . [i]f the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference."  40 C.F.R. § 1508.13.  As contemplated by this regulation, the finding issued by the Office of Surface Mining incorporates the environmental assessment.  The finding notes that while there will be short-term impacts, they will be minimal over the long term.  And it explains that "[m]itigating measures have been incorporated in the approved operation and reclamation plan that will support [the Office of Surface Mining's] finding of no major impacts from the proposed surface coal mining and reclamation operation."  JA 514.  As such, we conclude that the finding briefly states the reasons for its conclusion and directs readers to the environmental assessment for further discussion—just as the regulations permit.

Plaintiffs also argue that the environmental assessment does not sufficiently address noise and road-safety issues stemming from the proposed mining.  The agency, however, addressed both arguments in the environmental assessment, referring to several outside studies and conducting a study of its own on road safety.  Acknowledging that the mining will cause some impact in each area, the assessment concludes that it will be modest and ultimately insignificant.  *See* JA 542–43 (noting that noise "will have periodic adverse effects on the quality of life of residents living in close proximity to the mine site" but that it will be "infrequent[]" and less than what is tolerated in wildlife and recreation areas); JA 548 (noting that a study of the impacted roads determined that "a coal truck and a school bus can pass on this section of Lick Fork Road" save for two points on the road).  The assessment provides a serious discussion of these issues.  With regard to coal truck traffic, for example, it considers the anticipated time of day and week of those trips (during the day, Monday through Saturday), the number of anticipated daily trips (increasing from 25 to 30 to approximately 110), lines of sight at the intersection of the proposed haul road and Lick Fork Road (250 to 300 feet) and at the intersection of Lick Fork Road and State Highway 297 (700 to 1000+ feet), and the width of Lick Fork Road and State Highway 297 (adequate for passage of a coal truck and school bus—a school bus being the widest vehicle likely to travel the road—except in the two places indicated on Lick Fork Road).  While we agree with plaintiffs that it would have made sense for the agency to consider some of these matters in more detail—including, say, the number of bus trips occurring at times when coal trucks would be on Lick Fork—the statute requires an environmental assessment to contain only a "brief" discussion of impacts, and we cannot conclude that this assessment abused the agency's considerable discretion.

Plaintiffs further argue that the environmental assessment fails to account for certain environmental impacts. But one of them, the operation's sediment-control structures, was addressed by the cumulative hydrologic impact assessments completed as part of the Surface Mining Control and Reclamation Act process, which the agency incorporated into the environmental assessment. The agency has filed a supplemental environmental assessment addressing the other concerns in more depth, and plaintiffs have separately challenged it in the district court, making further comment on this point premature. Suffice it to say for present purposes, the environmental assessment and its reference to the cumulative hydrologic impact assessments precludes the assessment from being arbitrary and capricious. *See City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434, 440 (6th Cir. 2005) (noting that while on a more probing review there may be greater concerns, there is certainly "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached").

*Third*, plaintiffs argue that regulations promulgated under the National Environmental Policy Act require an agency that is going to issue a finding of no significant impact to make that document available to the public 30 days before its final decision. *See* 40 C.F.R. § 1501.4(e)(2) ("[T]he agency shall make the finding of no significant impact available for public review . . . for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin [if] (i) [t]he proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement . . . ."). The Office of Surface Mining's guidelines discuss proposals that must be given this 30-day review, two of which pertain here: (1) "[a]pproval of a proposed mining and reclamation plan that includes . . . Mountaintop removal operations"; or (2)(a) "[a]pproval of a proposed mining and reclamation plan for a surface mining operation [where] [t]he environmental impacts of the proposed mining operation are not adequately analyzed in an earlier environmental document," (b) "the area to be mined is 1280 acres or more, or the annual full production level is 5 million tons or more" and (c) "[m]ining and reclamation operations will occur for 15 years or more." 516 Dept. of the Int. Manual 13.4.A.

As shown, the coal company's application does not involve mountaintop removal as the Office of Surface Mining permissibly defines that phrase. Nor does the application satisfy the three conjunctive requirements necessary to come within the second category of operations requiring 30-day public review. Given the coal company's modifications to its application, just 1,148.7 acres will be affected by the license, an area that is more than 100 acres less than the threshold amount specified in the guideline and indeed only 970 of those acres will be mined.

III.

For these reasons, we affirm.