ANGLERS OF THE AU SABLE, Tim Mason, and Sierra Club (Mackinac Chapter), Plaintiffs,

v.

UNITED STATES FOREST SERVICE, and United States Bureau of Land Management, Defendants.

Case No. 05–10152.

United States District Court, E.D. Michigan, Southern Division.

July 10, 2008.

Aaron Isherwood, Sierra Club, San Francisco, CA, Bruce M. Pregler, Facca, Richter, Troy, MI, Marianne G. Dugan, Eugene, OR, Mark R. Daane, Hooper, Hathaway, Ann Arbor, MI, for Plaintiffs.

Gregory Daniel Page, U.S. Department of Justice, Washington, DC, Janet L. Parker, U.S. Attorney's Office, Bay City, MI, for Defendants.

*OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' OBJECTIONS, GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND GRANTING PLAINTIFFS' MOTION FOR CLARIFICATION*

DAVID M. LAWSON, District Judge.

This matter is before the Court on the defendants' objections to a report filed by Magistrate Judge Charles E. Binder recommending that the plaintiffs' motion for summary judgment be granted and the defendants' cross motion for summary judgment be denied. The plaintiffs also have filed a motion seeking clarification of the magistrate judge's report, which is addressed herein as well. The case was initiated by two environmental groups and one private citizen who contend that the United States Forest Service (Forest Service) and the United States Bureau of Land Management (BLM) violated their obligations under three federal acts in approving exploratory gas and oil drilling on a parcel of land within the Huron–Manistee National Forest. The plaintiffs ask this Court to review the agencies' decisions under the Administrative Procedures Act, and they seek declaratory and injunctive relief. In their eight-count amended complaint, the plaintiffs allege that the defendants violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, the National Forest Management Act, 16 U.S.C. § 1600 *et seq.*, the Mineral Leasing Act, 30 U.S.C. § 181 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 555 *et seq.*, by conducting a faulty environmental assessment (EA), improperly issuing a "Finding of No Significant Impact" (FONSI), and failing to prepare and issue an environmental impact statement concerning the project.

The Court referred the matter to Magistrate Judge Charles E. Binder for general case management, although the reference was temporarily withdrawn to adjudicate a motion for preliminary injunction. The magistrate judge issued his report on the parties' cross motions for summary judgment on June 20, 2006, and the defendants filed timely objections, to which the plaintiffs responded and the defendants replied.

The Court has reviewed the file, the report and recommendation, the defendants' objections, the responses, and replies, and has made a *de novo* review of the record in light of the parties' submissions. The Court agrees with the magistrate judge's conclusion that the defendants failed to comply with all of the procedural requirements of the National Environmental Policy Act, the environmental assessment is defective, and the finding of no significant impact is unsound. However, the magistrate judge did not address the plaintiffs' claims under the National Forest Management Act or the Mineral Leasing Act, and as to those claims (which are the subject of the plaintiffs' motion for clarification) the defendants are entitled to summary judgment.

I. Summary of decision

For reasons explained in detail below, the Court concludes as follows: First, The Forest Service acted arbitrarily and capriciously in finding that the leaseholder's (Savoy Energy, L.P.) proposed drilling project would have no significant environmental impact. NEPA requires that federal agencies prepare an environmental impact statement (EIS) for all major fed-

eral actions that "significantly" affect the environment. Significance is measured by the context and intensity of impact. The Council on Environmental Quality's (CEQ) regulations outline ten factors that federal agencies must evaluate when assessing the intensity of an action's environmental impact. The defendants overlooked or insufficiently addressed at least four of the of CEQ intensity factors in issuing a FONSI. First, the Forest Service failed to study the possible impact of the project on the unique recreational characteristics of the Mason Tract, and the concomitant effect that a degradation of the recreational experience could have on tourism at the local, county, and state levels. Second, several effects of Savoy's proposed project are highly uncertain, and the Forest Service has failed to explain why better data was not gathered. Third, the Forest Service did not address the impact the present action may have as a precedent for future decisions. Finally, the biological assessment is woefully inadequate in evaluating the possible impact of the drilling project on the Kirtland's warbler, an endangered species. Cumulatively, these oversights raise substantial questions about the significance of the proposed project, and the contrary evidence suggests a significant environmental impact.

Second, the Forest Service did not consider an appropriate range of alternatives to Savoy's proposed drilling project as required by NEPA and CEQ regulations. NEPA requires agencies to consider any appropriate alternatives to a project that might alter the cost-benefit balance. Agencies may not define their own objectives in such narrow terms as to prevent the meaningful consideration of alternatives. Here, the Forest Service failed twice: first, the Forest Service did not take the requisite "hard look" at the "No Action" alternative because it felt constrained (unduly) by law and by the terms of Savoy's mineral lease; second, the Forest Service did not consider alternative locations for the well's bottom hole, impermissibly deferring to Savoy's project objectives despite the fact that an analysis of those alternative locations is more consistent with the Forest Service's stated goals. The Forest Service's failure to consider important aspects of the problem before approving drilling constitutes arbitrary and capricious agency action in violation of the Administrative Procedures Act.

Third, the Court finds that the defendants are entitled to summary judgment on the plaintiffs' claim under the National Forest Management Act alleging a violation of the Huron–Manistee National Forest Land and Resource Management Plan (LRMP) because the plaintiffs have failed to show that the Forest Service contradicted the terms of the LRMP. Although the LRMP establishes that disturbance to old growth forest shall be avoided where feasible and encourages the maintenance of a natural environment and the elimination of unnecessary roads, it balances these interests against the desire to promote mineral exploration. The drilling project in this case does not contradict the LRMP's terms, and it appears to mesh with the spirit of the plan. Based on these circumstances and the fact that the Forest Service's interpretation of the plan is entitled to considerable deference, the plaintiffs' have failed to show arbitrary or capricious agency action.

Fourth, the defendants are entitled to summary judgment on the plaintiffs' claim under the Mineral Leasing Act because the plaintiffs have cited no legal authority for this claim. The plaintiffs allege that the defendants violated the MLA by contravening 43 C.F.R. § 3161.2. However, this regulation is phrased in very general, perhaps aspirational, terms. The plaintiffs seem to believe that section 3161.2 is vio-

lated every time NEPA is violated, but there is no authority for this novel proposition.

Therefore, the Court will grant in part and deny in part each party's motion for summary judgment, declare the EA and the FONSI inadequate, and enjoin the defendants from proceeding to authorize the proposed gas drilling project based on the FONSI.

## II. Facts and proceedings

The Court takes the facts from the administrative record, although the plaintiffs have attempted to supplement the record with declarations. The parties have not filed the entire administrative record with this Court, but instead they have designated and submitted portions of the administrative record. In actions seeking review under the Administrative Procedures Act (APA), a court's review is confined to the "whole record *or those parts of it cited by a party.*" 5 U.S.C. § 706 (emphasis added). In this case, the administrative record consists of seven binders of documents pertaining to the Forest Service's decision, and six folders of documents pertaining to the Bureau of Land Management's decision. Rather than producing the full record, the parties have chosen to produce and designate certain portions of the record for this Court's review. Given the scope of review, this presents no obstacle to the Court's ability to pass judgment. *See* 5 U.S.C. § 706.

In 2002, the BLM, with the consent of the Forest Service, began leasing 9,500 acres of subsurface federal oil and gas resources within the Huron–Manistee National Forest. Under the terms of the leases, the leaseholders acquire mineral rights, but they must submit separate applications to obtain permits to drill on the surface land. The applications must be approved by the BLM, Forest Service, the Michigan Department of Environmental Quality (MDEQ) and the Michigan Department of Natural Resources (MDNR) before drilling can commence. Under an interagency agreement established between the Forest Service and the BLM in 1991, the federal agencies' obligations are bifurcated; in essence, the Forest Service determines whether the surface aspects are consistent with federal law and policy, and the BLM addresses underground concerns. Pursuant to the agreement, the Forest Service takes the lead, but the decision to permit drilling and attendant surface operations is described as a collaborative effort:

"A. General—No oil and gas operations involving surface disturbance on [Forest Service] lands are permitted without approval from the [Forest Service]. The [Forest Service] shall have the lead for National Environmental Policy Act (NEPA) analysis and documentation for such operations. The BLM shall be responsible for addressing down-hole aspects of proposals. A single NEPA document is to be prepared to support all decisions to be made by [the Forest Service] or BLM on the proposed action, including decisions on off lease uses. NEPA documents shall be tiered to existing documents to the extent possible."

Pls.' Mot. for Prelim. Inj., Ex. B, Environmental Assessment (EA) at 8 (quoting interagency agreement).

Savoy Energy, L.P. (Savoy) holds three federal and three state subsurface mineral leases within the forest, comprising roughly 640 acres. In May 2003, Savoy filed an application with the BLM to drill a directional gas well into one of its lease holdings. Directional drilling involves entry of the surface at one point (the "top hole") to access minerals located at another point (the "bottom hole"), which does not lie directly below the top hole. Sa-

voy's proposed development involves clearing, grading, and leveling a 3.5–acre well pad, preparing a production facility approximately 1.5 miles from the well, and constructing a pipeline connecting the two locations. In September 2003, responding to public concern over visibility, noise, and the effect of road alterations, Savoy withdrew its initial application and filed a second application for drilling, with a new location for the top hole and the production facility. The project's dimensions did not change.

Savoy's proposal received significant public attention because the drilling target (i.e., the bottom hole) is beneath the Mason Tract, state land that is one of the most revered sections of forest in all of Michigan. The 4,700–acre Mason Tract was established in the 1950s by a gift to the State from naturalist George W. Mason. The gift was conditioned on a promise by the State to keep the land as a permanent game preserve, to limit camping significantly, and never to sell the land. *See* Michigan DNR Description of Mason Tract *at* http://www.michigan.gov/dnr/0, 1607,7–153–30301_30505_31025–66206—, 00.html (last visited July 8, 2008). In honor of his generosity, the state built a log-cabin chapel, known as the Mason Chapel, which today serves as a sanctuary for the fishermen, hikers, bicyclists, skiers, campers, hunters, and mushroom- and berry-pickers who frequent the area. Other development within the Mason Tract includes intermittent tree harvesting, and the maintenance of a cross-country ski trail, a campground, and the Mason Chapel parking lot. At present, the Mason Tract is accessible only by six miles of unimproved, seasonably passable roads.

The South Branch of the Au Sable River runs through the Mason Tract. This stretch of river is described as "probably the best brown trout water in the Great Lakes Region, and it may be the best east of the Rockies." Pls.' Mot. for Prelim. Inj., Ex. M, DNR Au Sable River Plan at 2. It is also popular for canoeing. The South Branch of the Au Sable is home to two federally protected species, the Kirtland's warbler (which is endangered) and the bald eagle (which is threatened).

Because the Mason Tract contains a "no surface occupancy" restriction, EA, App'x B at 14, Savoy proposes to engage in directional drilling, with a top hole located nearly half a mile southeast of the bottom hole. Therefore, although the ultimate drilling target is located beneath the state-owned Mason Tract, the top hole and the various drilling apparatuses would be positioned on federal land, in the Huron–Manistee National Forest. Due to the environmentally sensitive nature of the region, the area surrounding the Mason Tract is designated by the Forest Service as a Semi-primitive Non-motorized (SPNM) area, "characterized by few and/or subtle human modifications with a large probability of isolation from the sites and sounds of others." EA at 33. The SPNM area is mostly forested and, in 2003, the Forest Service designated the entire SPNM area an "old growth" region. The well pad, well head, and a portion of the pipeline would be located in this SPNM area. The production facility and the remainder of the pipeline would be located outside of the SPNM area, but still within the Kirtland's Warbler Management Area. The area encompassing the production facility is designated Roaded Natural, and is characterized by a "predominately natural environment," where "[e]vidence of the sights and sounds of humans is moderate but in harmony with the natural environment." EA at 33.

As part of the project, two Forest Service roads, FSR 4208 and FSR 4209, would be plowed to allow year-round vehicle access to the site. Both roads would be

widened, some trees would be removed, and portions of the surface would be improved to permit easier access. In addition, fifty feet of new road would be added to FSR 4208 to allow access to the well pad. If the well is productive, construction of the production facility would require clearing approximately two more acres and installing a gas-water separator, oil and brine tanks, a dehydrator, a compressor, and monitoring equipment. The well pad and the production facility would be connected by approximately 1.7 miles of pipeline that would be buried alongside the roads. The project calls for up to six feet of additional roadside clearing to accommodate the pipeline.

Construction of the well pad and access road would take approximately four days. The well itself would take another forty-five days to drill. If the well were productive, construction of the pipeline would require two weeks, and construction of the production facility would take another two months. Savoy proposes to complete all construction between December 1 and April 15, so as to minimize the disruption of the environment.

In August 2004, the Forest Service issued an Environmental Assessment (EA) and a Biological Assessment (BA). These documents detailed Savoy's proposed action, considered some alternative courses of action, and evaluated the impact of each alternative on the environment and forest wildlife. Based on these documents, Forest Supervisor Leanne M. Martin issued a Decision Notice and Finding of No Significant Impact (FONSI) on January 1, 2005, explaining that the environmental impact of the project was not expected to be significant. She approved Alternative 2, a slightly modified version of Savoy's proposal. *See* Pls.' Mot. for Prelim. Inj., Ex. A, FONSI at 1, 3–5 (describing Alternative 2 as "the same as the original Proposed

Action as outlined above, with additional conditions of approval to the SUPO [Surface Use Plan of Operations] based on mitigation measures"). The additional measures attendant to Alternative 2 include placing stumps out of view on FSR 4209 and FSR 4208; the imposition of reporting requirements for changes in equipment; construction of a dike around the oil and brine tanks of sufficient size to contain 150% of the total capacity of the tanks; and capping the sound level audible from 1,320 feet at 36 decibels (as opposed to the 45–decibel cap set forth in Savoy's proposal), in addition to a number of other noise-reduction measures. A "No Action" alternative was also considered. FONSI at 3; EA at 20. As its namesake suggests, the "No Action" alternative would simply amount to maintenance of the status quo. This alternative was rejected out of hand, however, because the Forest Service found that it "would not comply with the laws, regulations, policies and Forest Plan direction guiding mineral development on National Forest System ... lands." FONSI at 20; EA at 3.

According to the plaintiffs, the BLM approved Savoy's application for drilling on August 4, 2005, relying on the Forest Service's EA to reach that decision. The defendants have denied this allegation, but neither side has provided proof on this issue.

The plaintiffs in this case, Anglers of the Au Sable, Tim Mason, and the Mackinac Chapter of the Sierra Club, commenced the present action on June 8, 2005 alleging that the defendants, the Forest Service and the BLM, have violated their duties under the National Environmental Policy Act, the National Forest Management Act, and the Mineral Leasing Act. The plaintiff thereafter filed an amended complaint (making a non-substantive change), and the Court referred the matter to Magis-

trate Judge Charles E. Binder for general case management pursuant to 28 U.S.C. § 636.

On December 2, 2005, the plaintiffs filed a motion for a preliminary injunction, asking this Court to halt the commencement of the drilling project pending a final decision. Because the issue was time-sensitive, the Court decided to resolve the injunctive motion itself instead of utilizing the longer report and recommendation process. On December 7, 2005, the Court granted preliminary injunctive relief. *Anglers of the Au Sable v. United States Forest Serv.*, 402 F.Supp.2d 826 (E.D.Mich.2005). Following that decision, the Court referred the matter back to the magistrate judge for further proceedings consistent with the original order of reference. The parties' cross motions for summary judgement followed, and the magistrate judge issued his report on June 20, 2006, 2006 WL 5908358.

In his report, Magistrate Judge Binder recommended that the Court grant the plaintiffs' motion for summary judgment, deny the defendants' motion for summary judgment, enjoin the defendants from proceeding under the FONSI, and remand the matter to the defendants for further proceedings. Judge Binder found that the defendants had failed to adhere to NEPA's guidelines and therefore acted in an arbitrary and capricious manner in issuing the FONSI. In concluding that the project's impact would not be "significant" (such that a full-blown environmental impact statement was not necessary), Judge Binder suggested the defendants had paid only "lip service" to the relevant environmental regulations. R & R at 21. He viewed with skepticism the conclusion that a gas well drilling project that admittedly would alter scenic and primitive areas for up to 30 years, double noise levels in areas isolated from human contact, involve clearing old growth forest, and emit petroleum and engine exhaust odors would have no significant environmental impact. He observed that the defendants actually conceded substantial environmental impact in the EA (without calling it such), but nevertheless issued a FONSI, engaging in a sort of *non sequitur*. Judge Binder identified four effects that amounted to significant environmental impacts: (1) the effect on visual aesthetics; (2) emission of odor; (3) noise levels; and (4) disruption of protected wildlife and old growth forest. Judge Binder also opined that the defendants gave superficial consideration to alternatives, and had engaged in improper segmentation (a practice whereby an agency understates a project's potential impact by analyzing it in piecemeal fashion). Commenting on the biological assessment, the magistrate judge found the document to contain nothing but a conclusory assessment of the project's likely impact on the Kirtland's warbler and bald eagle. He suggested that the BA, and the FONSI which it informed, contained no "meaningful consideration of the Forest Service's duty under the [Endangered Species Act] to encourage the propagation and diffusion of endangered species." *Id.* at 26. In the end, therefore, Magistrate Judge Binder submitted that the plaintiffs were entitled to summary judgment on their claim alleging a violation of NEPA. However, although the motions before Judge Binder called for adjudication of all the plaintiffs' claims, Judge Binder never addressed the claims under the National Forest Management Act or the Mineral Leasing Act. As a result, the plaintiffs have filed a motion for "clarification" of the report, asking this Court to adjudicate the NFMA and MLA claims.

The defendants filed timely objections to the report and recommendation on July 26, 2006, and the plaintiffs responded thereto.

The defendants filed a reply, and the matter is now ready for decision.

### III. Standard of review

Objections to a report and recommendation are reviewed *de novo.* 28 U.S.C. § 636(b)(1). The Sixth Circuit has stated that "[o]verly general objections do not satisfy the objection requirement." *Spencer v. Bouchard,* 449 F.3d 721, 725 (6th Cir.2006). "The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Miller v. Currie,* 50 F.3d 373, 380 (6th Cir.1995). " '[O]bjections disput[ing] the correctness of the magistrate's recommendation but fail[ing] to specify the findings ... believed [to be] in error' are too general." *Spencer,* 449 F.3d at 725 (quoting *Miller,* 50 F.3d at 380).

■ The motions in this case request summary judgement. Generally, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing the decision of an administrative agency, however, a motion for summary judgment is merely the conduit to bring the legal question before the court; the usual tests of summary judgment, such as whether a genuine issue of material fact exists, do not apply. *See Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir.1999); *see also City of Cleveland v. Ohio,* 508 F.3d 827, 838 (6th Cir.2007) ("When a district court upholds on summary judgment an administrative agency's final decision under the Administrative Procedure Act, this court 'review[s] the district court's summary judgment decision de novo, while reviewing the agency's decision under the arbitrary and capricious standard.' ") (quoting *Coalition for Government Procurement v. Fed. Prison Indus., Inc.,* 365 F.3d 435, 457 (6th Cir. 2004)); *Pit River Tribe v. United States Forest Serv.,* 469 F.3d 768, 778 (9th Cir. 2006) ("Because this is a record review case, we may direct that summary judgement be granted to either party based on our *de novo* review of the administrative record.") (internal quotation marks omitted).

Where the Court must rule based on review of an administrative agency's final decision, review is governed by the Administrative Procedure Act. *Carabell v. United States Army Corps of Eng'rs,* 391 F.3d 704, 707 (6th Cir.2004). The APA provides that a court should set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). To assess whether an agency has acted arbitrarily or capriciously, the Court should consider whether

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Because analysis of the relevant documents "requires a high level of technical expertise," the Court must defer to "the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *see also Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) ("When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential."). The Court's inqui-

ry is " 'searching and careful,' but 'the ultimate standard of review is a narrow one.' " *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

■ Although the review is confined to the administrative record, the Court may consult documents outside the record, such as the declarations submitted by the plaintiffs, to determine if there is any information the agency should have considered but did not. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980); *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555 (9th Cir.1989).

### IV. The defendants' objections

The defendants' objections amount to an extension of the arguments made in support of their motion for summary judgment. The defendants defend the legitimacy of the methodology behind the FONSI, and argue that their ultimate conclusion was reasonable under the circumstances.

The defendants have made two general objections, and seven specific objections. The general objections—that the magistrate judge failed to show that there was no "rational connection" between the facts found and the choice made; and that the magistrate judge failed to give adequate deference to the Forest Service's decision—are so vague as to preclude meaningful review. They must be overruled. *See Spencer*, 449 F.3d at 725 (explaining that "[o]verly general objections do not satisfy the objection requirement").

Turning to their specific objections, the defendants first posit that the magistrate judge erred in concluding that the project would have a significant impact on the visual aesthetics of the area because he incorrectly suggested that FSR 4209 would fail to meet visual quality objectives under the project. They also state that the magistrate judge erred in suggesting road improvements would cause traffic to increase significantly in light of the modest nature of those improvements.

Second, the defendants object to the magistrate judge's analysis of noise levels because he focused on the potential noise level of a productive well rather than what the noise level would definitely be. They also point out that even if new wells were planned, they could not be built without additional drilling permits and additional environmental analysis. Moreover, the defendants believe that there is no evidence the noise levels that were bound to occur "would precipitate significant environmental impacts." Defs.' obj. at 8.

Third, the defendants object to the magistrate judge's finding that the drilling project would interfere with the preservation of old growth forest. Because the project only calls for the removal of 3.5 acres of the 3,505 acres designated as old growth, the defendants submit that there is no basis for a finding of significant impact.

Fourth, the defendants contend that the magistrate judge erroneously found that the Forest Service did not adequately consider the "unique characteristics" of the area, including the Mason Tract. According to the defendants, "the Forest Service documented the unique ecological characteristics of both the Mason Tract and the Huron's surrounding areas in detail." *Id.* at 10. Unlike the magistrate judge, however, the defendants gave due weight to the fact that there are numerous active oil and gas wells within several miles of the proposed site, and yet visitors continue to perceive their recreational experience as "pristine."

Fifth, the defendants object to the magistrate judge's finding that the Forest Service did not adequately consider alternatives. The defendants observe that the magistrate judge did not describe any feasible alternatives that should have been considered but were not. The magistrate judge suggested that the Forest Service should have considered drilling from more remote sites. However, the defendants state that these possibilities *were* considered, but they were rejected as "environmentally unsafe and technologically impractical." *Id.* at 12. In the defendants' view, consideration of three alternatives was sufficient to meet the demands of NEPA. They reason that "[t]ime and resources are simply too limited to hold that an [EA] fails because the agency failed to ferret out every possible alternative." *Id.* at 14.

Sixth, the defendants object to the magistrate judge's observation that the Forest Service engaged in improper segmentation when conducting its analysis. The defendants state that the Forest Service was not required to consider in depth possible future drilling for two reasons. First, they claim that any additional wells could not be constructed without additional drilling permits, environmental analysis, and (of course) the discovery of valuable minerals. Since the drilling of additional wells is not imminent, analysis under NEPA is not necessary at this juncture. Second, the defendants argue that there was no improper segmentation because "the exploratory well has 'independent utility,' regardless of whether Savoy builds or does not build future wells." *Id.* at 15.

Finally, the defendants argue that the Forest Service sufficiently analyzed the potential impact on the Kirtland's warbler and bald eagle. The defendants attack the magistrate judge's conclusion to the contrary on the grounds that he (1) superfi-

cially based his decision on the number of paragraphs in the BA devoted to the species, and (2) cited no evidence to contradict the Forest Service's finding.

## V. Discussion of the NEPA claim

■ The National Environmental Policy Act requires that federal agencies prepare a detailed environmental impact statement whenever undertaking "a major Federal action" that will "*significantly* affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C) (emphasis added). The EIS requirement has twin aims. First, it obligates federal agencies to consider the significant environmental impacts of proposed actions. *Baltimore Gas,* 462 U.S. at 97, 103 S.Ct. 2246. Second, it ensures that the public is informed of the agency's decision-making process and environmental concerns. *Ibid.* These aims do not require agencies to elevate environmental concerns above all other appropriate considerations. Rather, they simply demand that the agency take a "hard look" at the environmental consequences of a proposed action before taking an irreparable step. *Ibid.* Thus, NEPA's mandate is merely procedural; it does not require particular outcomes. *See Save Our Cumberland Mountains v. Kempthorne,* 453 F.3d 334, 338 (6th Cir.2006). NEPA also established the Counsel on Environmental Quality (CEQ) to review and develop environmental policies for the nation. *See* 42 U.S.C. §§ 4341–47. The CEQ has promulgated regulations that help determine whether an EIS is needed—that is, to determine whether a project's impact on the environment likely will be "significant." *See* 40 C.F.R. § 1501.4. If it is unclear whether an EIS is needed—if the proposed agency action is neither one that typically requires an EIS, nor one that is categorically excluded from the EIS requirement—the CEQ regulations require the agency to prepare an environmental

assessment (EA). 40 C.F.R. § 1501.4(b). An EA is a concise document that allows agencies to consider the environmental concerns associated with a proposed project while conserving agency resources for those projects in which a full EIS is required. *Sierra Club v. Slater,* 120 F.3d 623, 635 (6th Cir.1997); *see also Louisiana Crawfish Producers Ass'n–West v. Rowan,* 463 F.3d 352, 356 (5th Cir.2006) (describing an EA as "a rough cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary") (internal quotation marks omitted). The EA is only a first step; it merely informs an agency's decision either to prepare an EIS or to issue a FONSI, in which case an EIS would not be required. *Charter Twp. of Huron, Mich. v. Richards,* 997 F.2d 1168, 1174 (6th Cir.1993).

No one questions that the proposed drilling plan in this case is a major federal action. *See* 40 C.F.R § 1508.18 (defining major federal actions as "actions ... potentially subject to Federal control and responsibility"). Rather, the present dispute centers on the defendants' compliance with NEPA and with CEQ regulations in determining whether the impact of Savoy's proposal would be environmentally significant, triggering NEPA's EIS requirement. The plaintiffs contend that the Forest Service failed to properly assess the intensity of the environmental impact—including the effect of the project on the area's unique characteristics, the controversy and uncertainty of the impact, the cumulative and precedential effects of the project, and the effect of the project on federally protected species. Additionally, the plaintiffs contend that the Forest Service violated their obligations under NEPA by failing to consider an adequate range of alternatives

to the proposed project before issuing a decision notice. Many of the plaintiffs' claims have merit and lead to the conclusion that the agency's decision that the drilling project would have no significant environmental impact was arbitrary and capricious.

## A. The United States Forest Service incorrectly assessed intensity of impact

CEQ regulations direct federal agencies to determine the "significance" of a project's environmental impact by considering "both context and intensity." 40 C.F.R. § 1508.27. Proper assessment of an impact's intensity requires consideration of the following ten factors:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to

anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b).

■■■ As long as the agency has engaged in a "reasoned evaluation of the relevant factors," *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851 (internal quotation marks omitted), a conclusion that the environmental impact of a project is insignificant lies well within an agency's discretion, *see Cumberland Mountains*, 453 F.3d at 341. However, as the Ninth Circuit has noted, in challenging an agency's decision to issue a FONSI, "a plaintiff need not show that significant effects *will in fact occur* [;] raising substantial questions whether a project may have a significant effect is sufficient." *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir.1998) (internal quotation marks omitted); *accord Shenandoah Ecosystems Defense Group v. United States Forest Service*, 194 F.3d 1305, *7 (4th Cir.1999) (Table). The plaintiffs contend that the Forest Service failed to analyze several intensity factors properly in concluding that the proposed drilling will have no significant impact, and Magistrate

Judge Binder agreed. For the reasons that follow, this Court concurs in some of those determinations but must reject others.

### 1. Unique characteristics

CEQ regulations require an agency to consider the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, ... wild and scenic rivers, or ecologically critical areas" when determining whether a proposed project will have a significant environmental impact. 40 C.F.R. § 1508.27(b)(3).

The plaintiffs contend that the drilling site in this case is home to unique human recreational experiences that will be significantly affected by the proposed action, and that the Forest Service failed to consider the effect of the proposed drilling on recreational tourism in the region and in the State. The plaintiffs produce the testimony of several of their members and other sympathetic persons to support their assertions. For instance, Charles Guenther, former Wildlife Chief for the Michigan Department of Natural Resources notes that "[t]he[ ] proposed clearing and site preparations would create a[n] irretrievable loss of hunting opportunity and certainly have a negative impact on the local economy, as hunters [would] locate in other areas for these recreational activities." Guenther Dep. at ¶ 5.

The defendants object to this and other testimony because it was not a part of the administrative record at the time of the FONSI. Although the defendants are correct that the plaintiffs may not augment the record by merely changing the quantum of information in it, *see Overton Park*, 401 U.S. at 416, 420, 91 S.Ct. 814, this Court is permitted to extend its review beyond the administrative record where the plaintiff alleges that an agency has

neglected to mention a serious environmental consequence, or has "swept stubborn problems or serious criticism ... under the rug," *Or. Natural Res. Council v. Lowe,* 109 F.3d 521, 526–27 (9th Cir.1997) (internal quotation marks omitted). The plaintiffs' evidence not only alerts this Court's attention to an environmental consequence that was not addressed in any depth in the EA, but it also demonstrates the ease with which the defendants could have acquired additional information about recreational tourism.

Recreational tourism was addressed in the EA by the Forest Service only in Appendix A, where it was identified as a "non-significant issue." EA at 70. The Forest Service noted that "[i]n personal discussions with a Forest Economist in East Lansing, Michigan, there are many variables that influence the local economy and specifically tourism, not just one thing," and that "[o]ther wells drilled in the vicinity ... have not reduced the amount of tourism to the area." *Ibid.* (errors in original). That same "Forest Economist" (he is actually an economist for the Forest Service) recommended that the Forest Service interview both local business owners and area visitors. However, there is no evidence that the Forest Service conducted such a survey, yet the outpouring of public comments—including comments from Michigan's Governor, the County of Crawford, and the Michigan Environmental Council, among others—suggests that the project's impact on recreation and tourism could be substantial. When the issue was repeatedly raised again during the public comment period, the Forest Service responded with references to the mitigation measures adopted (regarding noise and visual quality) and to Appendix A of the EA.

Magistrate Judge Binder did not address the impact of the project on unique recreational experiences in his report; he nevertheless concluded that both the EA and the FONSI merely paid "lip service" to the unique characteristics and ecologically critical areas of this section of the forest, "effectively disregard[ing]" these considerations in reaching their conclusions. R & R at 21. Citing three factors—visual quality, noise, and old growth tree stands—Judge Binder stated that the Forest Service's analysis amounted to a *"non-sequitur." Id.* at 20.

The defendants contend that Judge Binder erred by not affording the conclusions of the Forest Service appropriate deference. It is true that the Forest Service's treatment of this intensity factor is arbitrary and capricious if its conclusion that the impact would not be significant runs counter to the evidence that was before the agency and is so implausible that it cannot be ascribed to a difference in view or to agency expertise, or if the Forest Service failed to consider a unique characteristic of the project area. *Motor Vehicle Mfrs. Assn.,* 463 U.S. at 43, 103 S.Ct. 2856. The defendants point to the analysis in the EA of the three factors referenced above by Judge Binder—visual quality, noise, and old growth forest—and provide an explanation for why these factors will not be significant: first, the only road which will not meet the Visual Quality Objective for the SPNM area within one growing season is FSR 4208, "a tiny fragment of the 977,326–acre Huron Forest," Defs.' Obj. at 5; second, even with the foreseeable development of three additional wells, the noise from the production facility would not exceed existing noise standards and would be subject to oversight from the Department of Environmental Quality; third, the project calls for the removal of only 0.099% of South Branch old growth forest, which would have no appreciable effect on the old-

growth tree stand or on wildlife dependant on old growth trees.

In providing the appropriate level of deference, the Court may not "substitute [its] judgment of the environmental impact for the judgement of the agency." *Kelley v. Selin,* 42 F.3d 1501, 1518 (6th Cir.1995) (internal quotation marks omitted). In determining that the project would have no significant impact on the unique characteristics of the area, the Forest Service supported its conclusions with reference to the evidence it had gathered, and in that aspect the decision cannot be considered arbitrary when confined to consideration of visual quality, noise, or old growth tree stands. However, this Court cannot accept the defendant's assertion that it has taken a "hard look" at the effects of the proposed action on the unique recreational aspects of the area. Both the evidence provided by the plaintiffs and the evidence contained within the administrative record raise substantial questions about the significance of this project's effects on an area renowned for its recreational opportunities. The defendants' contention that "many variables ... influence the local economy and specifically tourism, not just one thing" does not relieve the burden set by NEPA to examine thoroughly and critically the influence of the project on this "one thing": recreation and tourism. The Court concludes that the defendants "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Assn.,* 463 U.S. at 43, 103 S.Ct. 2856, rendering their decision arbitrary and capricious.

### 2. Controversy and uncertainty

CEQ regulations require an agency undertaking a major federal action to consider the extent to which the proposed action is both "highly controversial" and "highly uncertain." 40 C.F.R. §§ 1508.27(b)(4)-(5). Although these factors are not "categorical rules that determine by themselves whether an impact is significant," *Spiller v. White,* 352 F.3d 235, 243 (5th Cir.2003), the presence of controversy or uncertainty will often lead courts to require a fullblown EIS, *see, e.g., Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 736–37 (9th Cir.2001). Because the level of controversy and uncertainty must be "high" to warrant consideration, the Court considers only controversy and uncertainty that raise substantial questions about the significance of the project's environmental impact. *See Native Ecosystems Council v. United States Forest Serv.,* 428 F.3d 1233, 1240 (9th Cir.2005) ("Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain.").

The Sixth Circuit has not yet established a test to determine which impacts are "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4), but most jurisdictions agree that the term means more than mere public opposition; it requires "a substantial dispute ... as to the size, nature, or effect of the major federal action." *Coliseum Square Ass'n, Inc. v. Jackson,* 465 F.3d 215, 234 (5th Cir.2006) (internal quotation marks omitted); *see also Ind. Forest Alliance, Inc. v. United States Forest Serv.,* 325 F.3d 851, 857 (7th Cir.2003); *Town of Cave Creek v. F.A.A.,* 325 F.3d 320, 331 (D.C.Cir.2003); *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998); *North Carolina v. F.A.A.,* 957 F.2d 1125, 1133–34 (4th Cir.1992) (noting that allowing bare opposition to suffice as controversy would open agency action to "govern[ance] by a heckler's veto") (internal quotation marks omitted).

A substantial dispute exists when "evidence, raised prior to the preparation of an

EIS or FONSI, casts serious doubt upon the reasonableness of the agency's conclusions." *Nat'l Parks*, 241 F.3d at 736 (internal citation omitted). Such evidence generally challenges the scope of the scientific analysis, the methodology used, or the data presented by the agency. *See Blue Mountains*, 161 F.3d at 1212–13 (citing the Forest Service's failure to consider the recommendations and data of an independent scientific report that ran contrary to the proposed action as evidence of controversy); *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988) (pointing to "affidavits and testimony of conservationists, biologists, and other experts who were highly critical of the EAs and disputed the Forest Service's conclusion that there would be no significant effects from logging because the sequoias could be protected and their regeneration enhanced," and concluding that "this is precisely the type of 'controversial' action for which an EIS must be prepared").

Even in the face of a substantial dispute as to the size, nature, or effect of the proposed action, an agency must have the discretion to rely on the reasonable findings of its chosen expert. *See Marsh*, 490 U.S. at 377–78, 109 S.Ct. 1851. Therefore, an agency that considers the dispute and addresses any concerns in its final decision likely will survive the very narrow review standard under the APA. *Forest Alliance*, 325 F.3d at 858 (holding that an agency's consideration and resolution of the dispute is properly thought of as a second step in the controversy analysis); *accord Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1122 (9th Cir.2000).

In alleging that the proposed drilling is likely to be highly controversial, the plaintiffs point to concerns expressed by the Department of Environmental Quality, the Michigan Environmental Council, the Michigan Department of Natural Resources, the County of Crawford, Governor Granholm, United States Senators Carl Levin and Debbie Stabenow, United States Representative Bart Stupak, Michigan Representative Matt Gillard, Michigan Trout Unlimited, and numerous private commentators, including a biology professor and citizen whose "granddad knew Mr. Mason." Pl.'s Br. in Supp. at 18–20; Exs. O and P, Excerpts of Comments. Most of these concerns focus on the visual impact and noise of the project. Magistrate Judge Binder considered this evidence and agreed with the plaintiffs, concluding that "the intensity of the public comment made at every opportunity makes clear that this project is 'likely to be highly controversial' within the meaning of the CEQ regulations." R & R at 21.

However, the plaintiffs demonstrate only mere public opposition; they present no evidence disputing the size, nature, or effect of the project. At no point do the plaintiffs assert that the defendants failed to analyze some likely effect of the proposed drilling, nor do they challenge the credibility of the defendants' experts, data, or methodology. Instead, the plaintiffs cite general concerns about the impact of the drilling and criticisms of the EA. The plaintiffs are not entitled to manufacture controversy in such a manner. The words of the Sixth Circuit are instructive here:

So long as mining involves the initial destruction of the earth's surface, it will have some near-term effect on the environment. The critical question is what the company proposes to do about it. The company in this instance responded to initial concerns that the agency raised about the application, proposed measures to mitigate the near-term damage to the environment and proposed measures designed to restore the

environment to its pre-mining state. In addition to raising these concerns, the agency thoroughly examined the application and the environmental consequences of granting the license. Under these circumstances, the agency did what the law required it to do ... and its decision that the effects of the mining would not be significant lay well within its discretion.

*Cumberland Mountains,* 453 F.3d at 341. Moreover, requiring an EIS based on nothing more than public controversy over the significance of the effects disclosed in the EA penalizes an agency for precisely the type of candid disclosure that NEPA seeks to promote. *See Native Ecosystems,* 428 F.3d at 1240.

Additionally, the Forest Service has considered and responded to the concerns raised in a variety of ways: negotiating with Savoy to move the wellhead, implementing mitigation measures to reduce the visual impact as well as the impact from noise and odor, and addressing reclamation of the site when the well ceases to be productive. In fact, two of the agencies cited by the plaintiffs as expressing concerns—the Michigan Department of Environmental Quality and the Michigan Department of Natural Resources—eventually approved the proposed drilling. Therefore, considering that the plaintiffs have failed to produce evidence of a substantial dispute that rises above mere public opposition and to demonstrate that the Forest Service did not consider and address the public concerns in their final decision, and because the command of NEPA is, in the main, procedural, the Court finds that the environmental impact of the proposed drilling project is not highly controversial within the meaning of the CEQ regulations.

However, the determination of "significance" also turns on whether the environmental effects of a proposed agency action are highly uncertain or involve unique or unknown risks. 40 C.F.R. § 1508.27(b)(5). Although no hard-and-fast rule is available to determine the certainty of environmental impacts, the Ninth Circuit has tied the requirement to the purpose motivating an EIS generally:

> Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent "speculation on potential ... effects. The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action."

*Nat'l Parks,* 241 F.3d at 732 (quoting *Sierra Club,* 843 F.2d at 1195) (alteration in original) (internal citations omitted). Where an EA lacks certainty on one or more issues, it is the responsibility of the agency to provide a "justification regarding why more definitive information could not be provided." *Blue Mountains,* 161 F.3d at 1213 (internal quotation marks and citation omitted). "[L]ack of knowledge does not excuse the preparation of an EIS; rather it requires the [agency] to do the necessary work to obtain it." *Nat'l Parks,* 241 F.3d at 733.

Review of the administrative record in this case highlights four areas of uncertainty: impact from automobiles, impact from odors, effect on wildlife, and effect on tourism.

In the EA, the Forest Service predicts that road improvements could create a "minor longterm increase in vehicle traffic," as "[p]eople with sedans are more likely to drive down an improved road." EA at 38. The Forest Service speculates that "[s]ome visitors might notice the increase in traffic which could impact their recreational experience." *Ibid.* Given the

low density of traffic on FSR 4209—four to seven vehicles per day in the summer—the addition of a single car per day could increase the likelihood of a visitor encountering the accompanying sights, sounds, and smells by as much as 25%. The Forest Service neither provides quantifiable information about the likely increases in traffic nor attempts to justify the absence of such information.

Although the EA identifies three sources of odor that could impact visitors to the forest, it provides only conclusory statements about the duration and intensity of odors while failing to cite a source for this information. First, the EA states that drilling would produce burning hydrogen sulfide on "several" occasions, each lasting about one to two weeks, that would be detectable "hundreds of feet in the down wind area of the drilling pad." EA at 44. Second, the production facility would produce compressor exhaust and fumes from petroleum storage. The Forest Service asserts that, although the odor would be detectable "in the immediate vicinity," it would not be detectable in the SPNM area, and "would not likely be detectible to people driving by the production facility most of the time." *Ibid.* Third, the construction of the well pad, the road improvements, and the drilling phase would result in odors from heavy equipment that would be detectable at "a few hundred feet." *Ibid.* The record contains no data whatsoever supporting the Forest Service's vague assertions regarding the duration and intensity of these odors.

The EA also acknowledges that the proposed action would result in "temporary or permanent displacement" of some wildlife in the area, and the possible killing of species that have "limited dispersal capabilities," yet denies that the project would have any impact on the viability or habitat of wildlife in the project area. *Id.* at 60–

61. At least part of the justification for this conclusion is that the project area comprises less than two percent of the analysis area. *Id.* at 61. The EA does not explain why such a large area was analyzed, nor does the use of this broad-context analysis alleviate the burden on the Forest Service to address the certainty of the impact on wildlife in the immediate vicinity of the project. *See Anderson v. Evans,* 371 F.3d 475, 490–92 (9th Cir. 2004) (requiring an EIS where the effects of whaling on a small group of gray whales was highly uncertain, despite certainty that the project would have no significant effect on the broader gray whale population). The EA also notes that construction will provide foraging habitat for the brown-headed cowbird, but provides no analysis of how an increase in the population of the cowbird—a notorious "nest parasite," Pl.'s Mot. for Summ. J., Ex. Q, FWS Fact Sheet re Kirtland's Warbler at 2—may affect other species in the area. Finally, the EA provides no analysis on how construction may affect tourism beyond noting that some visitors may choose to go elsewhere. The record reflects a partial explanation for the lack of information. A Forest Service economist indicated that the suggested method for assessing the impact drilling might have on tourism—correlating tourism with the number of active oil and gas wells in the county—would be unreliable. The economist suggested that a better approach might simply be to interview business owners and area visitors. But the Forest Service never conducted the suggested survey, and instead concluded that the effect on tourism is a non-significant issue.

Although perhaps the failure of data or analysis on a single issue discussed above may not demonstrate findings that are "highly uncertain," the accumulation of numerous vague, conclusory, and incomplete analyses certainly raises "substantial ques-

tions" about the possible significance of the project's impact. The Court finds that this uncertainty is enough to trigger an EIS.

### 3. Precedent and cumulative impact

In assessing intensity, an agency is required to evaluate both the cumulative impact of a proposed action, defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions," 40 C.F.R. § 1508.7, and the degree to which a proposed action may establish a precedent for future actions, 40 C.F.R. §§ 1508.27(b)(6)-(7). Here, the analysis of the project's cumulative impact was not contested beyond an improper segmentation claim that fails because the Forest Service is not currently considering any other proposed projects, even if further development is reasonably foreseeable. However, the outcome of this project likely sets a precedent for future drilling in the region, an effect that was not considered in the EA.

 CEQ regulations require agencies to consider whether a proposed action is related to other actions "with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). One purpose of this requirement is the prevention of improper segmentation of a project. Improper segmentation occurs when a project that normally would require an EIS is subdivided into component parts that individually have no significant environmental impact. *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 962 (7th Cir.2003). The standard test for improper segmentation is whether "the proposed component action has little or no independent utility and its completion may force the larger or related project to go forward notwith-

standing the environmental consequences." *Hirt v. Richardson*, 127 F.Supp.2d 833, 842 (W.D.Mich.1999); *see also Historic Pres. Guild v. Burnley*, 896 F.2d 985, 991–92 (6th Cir.1989) (noting that when two proposed projects "each have such little value in their own right that their separate construction could be considered arbitrary or irrational, the court will find them to be a single project") (internal quotation marks omitted). The doctrine of improper segmentation is limited, however, to proposed actions; NEPA " 'does not require an agency to consider the possible environmental impacts of less imminent actions.' " *City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434, 442 (6th Cir.2005) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 20, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).

The plaintiffs do not contend that the Forest Service has failed to consider the cumulative impact of the exploratory drilling project; they argue instead that the project was improperly segmented by not including in the analysis the impact of other likely wells. The Forest Service acknowledges that proposals for three additional wells are likely if the exploratory well is productive, but it notes that future wells have not been proposed, and any future wells will require individual permit applications and environmental assessments. The plaintiffs' claim that the present well has no utility absent future wells is not supported by the record. If the presently proposed well produces, it will have value unto itself. Even if Savoy does not find what it seeks, the drilling project would still bear value because Savoy would know to avoid investing in the area. This Court finds no improper segmentation because the future wells are not yet "imminent." Indeed, the very point of an exploratory well is to evaluate the possibilities for future development; additional wells will not be proposed unless the first

well is productive. Of course, if that eventuates, the cumulative effect of the present project, should it go forward, must be taken into account in assessing the new proposal.

The other side of the segmentation coin, however, is the sixth intensity factor: whether a proposed action may establish a precedent for future actions with significant effects. 40 C.F.R. § 1508.27(b)(6). "The purpose of that section is to avoid the thoughtless setting in motion of a 'chain of bureaucratic commitment that will become progressively harder to undo the longer it continues.'" *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162–63 (9th Cir.1998) (quoting *Sierra Club v. Marsh,* 769 F.2d 868, 879 (1st Cir.1985)). In *Presidio,* the court determined that there were no precedential concerns where the proposed project was unique, and no similar or related projects were being contemplated. In the more recent decision of *Anderson v. Evans,* 371 F.3d 475 (9th Cir. 2004), the court required an agency to prepare a full EIS where the agency had not considered the possibility that its decision, although limited in both scope and duration, might affect future agency deliberations. *Id.* at 493.

*City of Sausalito v. O'Neill,* 386 F.3d 1186 (9th Cir.2004), exemplifies the depth of analysis contemplated by the CEQ regulations. There, the National Park Service adopted a proposal to develop a conference center and retreat center at Fort Baker— "one of the most special gems" of the Golden Gate Recreation Area. *Id.* at 1194– 96. The Park Service provided information about the "likely community and commercial impacts of the Plan on the regional economy" and placed the impacts in the context of regional land use plans. *Id.* at 1211. The Park Service considered, for example, how the need for dining and lodging services to accommodate conference center guests and employees of the conference center would likely spur private development near the fort. The quality of this analysis satisfied the court that the Park Service had made an informed decision about the project's precedential effect.

However, in the present case, there is no evidence that the Forest Service considered the precedential impact of its decision to approve Savoy's drilling project. Unlike in *Presidio,* the proposed project is not unique: the Forest Service acknowledges that if the proposed well is productive, the development of three additional wells is likely. Although each of the future wells would require individual EAs prior to approval, the Forest Service has not assessed the extent to which approving the current proposal could affect those future decisions. Just as the Forest Service frequently references the currently active wells in the Huron–Manistee Forest to help justify its FONSI, allowing drilling so near the Mason Tract would almost certainly color the Forest Service's analysis of the environmental impact of these future wells. Finally, the Forest Service has engaged in none of the sophisticated analysis of precedential effect exemplified by *Sausalito.* In particular, the EA does not fully consider the "likely community and commercial impacts of the Plan on the regional economy." *See Sausalito,* 386 F.3d at 1211. This failure fortifies the Court's conclusions that the Forest Service has failed to take a "hard look" at the precedential effect of its decision, and the EA does not provide sufficient information from which the agency could have made an informed decision.

### 4. Endangered species

■ The "significance" of a proposed project's environmental impact also must be evaluated in light of "the degree to which the action may adversely affect an endangered or threatened species or its

habitat." 40 C.F.R. § 1508.27(b)(9). Not all adverse effects to an endangered or threatened species require an EIS, however; the question ultimately is one of degree. *See Envtl. Prot. Info. Center v. United States Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir.2006); *see also Native Ecosystems*, 428 F.3d at 1240 (rejecting need for EIS despite FONSI's acknowledgment of project's impact on individual goshawks and their habitat where Forest Service concluded impact on species was insignificant). In *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1276 (10th Cir. 2004), the Tenth Circuit noted that a proposed project did not significantly affect a threatened species where (1) the mitigation measures in place greatly reduced the likelihood that the species would be affected significantly, (2) the agency's determination that the project's effect would be insignificant was based on two extensive studies, and (3) the effect of the project varied with the idiosyncracies of the particular animals impacted, making further analysis fruitless.

In contrast, the BA prepared by the Forest Service in this case is woefully inadequate in assessing potential impact on the Kirtland's warbler. Although acknowledging that both the proposed production facility and approximately one mile of the proposed pipeline are within the Kirtland Warbler's Management Area (KWMA), the BA concludes that the proposed project "would have NO EFFECT on the Kirtland's warbler," because the project does not physically encroach on the warbler's "essential habitat." *Id.* at 14–15. But the BA ignores the potential effect of nonphysical invasions—such as odor or noise—upon the Kirtland's warbler; it does not even discuss those factors. Further, a project still may affect an endangered or threatened species significantly without affecting its essential habitat. *See Greater Yellowstone*, 359 F.3d at 1275

("The fact that the FWS has not designated this, or any, territory as the bald eagle's 'critical habitat' does not alone persuade us that its potential destruction should not be considered 'significant' for purposes of NEPA."). As the magistrate judge pointed out, one way in which the warbler may be affected is by an increase in brown-headed cowbirds within the KWMA. *See* EA at 61 (explaining that construction may increase the foraging habitat of the cowbird); FWS Fact Sheet re Kirtland's Warbler at 2 (explaining the threat cowbirds pose to the Kirtland's warbler). At one point the BA asserts that construction that actually is inside the KWMA and that borders the warbler's essential habitat would not affect the warbler because the trees to be removed would be across a road from the essential habitat. BA at 14 ("Although River Lake Road from Forest Road 4209 to the production facility would be widened by approximately five-ten feet for pipeline installation, the road would be widened only to the north to avoid Kirtland's warbler essential habitat to the south.").

This Court finds that the Forest Service did not take the requisite "hard look" at the likely effects of construction on the Kirtland's warbler.

### B. The United States Forest Service failed to consider appropriate project alternatives

NEPA requires that agencies "study, develop, and describe appropriate alternatives" to the proposed course of action. 42 U.S.C. § 4332(2)(E). Consideration of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. This requirement exists to "ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (*including total abandonment of the*

834

*project*) which would alter the environmental impact and the cost-benefit balance." *NRDC v. Tenn. Valley Auth.*, 502 F.2d 852, 853 (6th Cir.1974) (emphasis added).

An agency need not consider alternatives that are inconsistent with the agency's basic policy objectives or the project's essential purpose. *See Cumberland Mountains*, 453 F.3d at 342–44; *Mayo Found. v. Surface Transp. Bd.*, 472 F.3d 545, 550 (8th Cir.2006); *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir.2006); *Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir.2006). However, an agency may not define the objectives of its action in such unreasonably narrow terms as to make consideration of alternatives a mere formality. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C.Cir.1991). Additionally, "NEPA requires an agency to 'exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project' and to look at the general goal of the project rather than only those alternatives by which a particular applicant can reach its own specific goals." *Envtl. Law & Policy Ctr. v. United States Nuclear Regulatory Comm'n*, 470 F.3d 676, 683 (7th Cir.2006) (quoting *Simmons v. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir.1997)).

These requirements also extend to the preparation of an EA. 40 C.F.R. § 1508.9(b) ("[EAs] [s]hall include brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."). However, an agency's duty to consider alternatives in preparing an EA is less than when preparing a full-blown EIS. *Cumberland Mountains*, 453 F.3d at 342–43. " '[A]lthough consider-

ation of some range of alternatives is essential to any environmental assessment, it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway.' " *Id.* at 343 (quoting *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir.1994)).

Here, the Forest Service's consideration of alternatives was faulty for two reasons: first, it did not take the requisite "hard look" at the No Action alternative, since it mistakenly considered itself obligated by both policy and by the terms of Savoy's lease to adopt an action alternative; second, the agency impermissibly narrowed the range of alternatives by only considering those consistent with Savoy's project objectives, rather than Forest Service goals.

The Forest Service rejected the No Action alternative because it "would not comply with the laws, regulations, policies, and Forest Plan direction guiding mineral development on National Forest System (NFS) lands." FONSI at 3; EA at 20. However, the Forest Service has failed to demonstrate that denying Savoy's proposed Surface Use Plan actually would violate any law, regulation, policy, or the Forest Plan. The Forest Service cites nine separate laws, regulations, or policies that each place exploration and development of mineral resources among the Forest Service's legitimate objectives, but none of the cited authorities mandates approval of proposed mineral extraction, forecloses a decision of No Action, or places the Forest Service's objectives at odds with environmental preservation.

For example, 43 C.F.R. § 3161.2, which directs an authorized officer to "approve and monitor ... proposals for drilling, development or production of oil and gas,"

requires that "all operations be conducted in a manner which protects other natural resources and the environmental quality," and provides that "[b]efore approving operations on [a] leasehold, the authorized officer shall determine ... that the proposed plan ... is sound both from a technical and environmental standpoint." 43 C.F.R. § 3161.2. The plain language of the regulation makes clear that approval is not appropriate in all cases, particularly cases where the project poses a threat to environmental quality.

The Forest Service also cites 36 C.F.R. § 228.107, which directs it to "ensure that ... [t]he surface use plan of operations is acceptable, or is modified to be acceptable, to the authorized Forest officer based upon a review of the environmental consequences of the operations." 36 C.F.R. § 228.107(a)(4). However, the same regulation requires that the surface use plan be consistent with "applicable Federal laws." 36 C.F.R. § 228.107(a)(1). It would be absurd to conclude that the regulation's requirement that the plan be modified until acceptable prevents the Forest Service from fully considering a No Action alternative, as required by NEPA. Similarly, the Forest Service's goals to "provide for economically and environmentally sound exploration, extraction, and reclamation practices" and to "encourage inventory and development of Federal minerals, [and] respect private mineral rights" are limited by "Standards and Guidelines" that direct surface-disturbing exploration to be permitted "in *most* areas" with "consent to mineral extraction plans ... determined by the environmental protection guidelines." EA at 4 (emphasis added). The Sixth Circuit rejected a similar argument when it found that "the agency [failed to] demonstrate[ ] that the Mining Act pulls it in one direction while the Environmental Act pulls it in another when it comes to the review of this mining application." *Cum-*

*berland Mountains,* 453 F.3d at 344. The same conclusion is compelled here.

It is also evident that the Forest Service felt constrained from fully considering the No Action alternative by Savoy's mineral lease. The Forest Service's response to public comment is particularly illuminating on this point:

**8. There is no economic need for this project.**

*This is outside the scope of the project. [Savoy ] has a legal right to fully explore and develop the resource as stated in their lease.*

. . .

**13. Why should we allow drilling at this time?**

*Response:* Through the existing state and federal leases, [Savoy] has acquired the right to extract and dispose of the specific mineral resource covered by the lease, subject to the terms and conditions of the lease. [Savoy] has submitted the necessary documentation and a decision ... is required ....

**14. Why not wait until some time in the future when drilling techniques will surely improve?**

*Response:* The Forest Service and BLM have the responsibility to respond to requests for development on authorized leases.

EA, Ex. A at ¶ 8, Ex. B at ¶¶ 13–14. These exchanges reveal the Forest Service's mind set that it considered itself obligated by Savoy's lease to approve either Savoy's initial proposal or a modified version of Savoy's proposal, and never realistically contemplated denying the application for drilling altogether.

The Forest Service's sense of constraint is even more disconcerting when viewed in conjunction with the Forest Service's justification to lease mineral rights in the first

place. In responding to public concern about leasing mineral rights so near the Mason Tract and the Chapel, the Forest Service noted, "Based on the best available information, the reasonably foreseeable development scenario ... outlines *no known exploration targets* within these lease tracts, and in the professional judgement of the BLM geologist who predicted probable development, it is indicated that *no wells are likely*." Pl.'s Ex. N, FONSI re Lease at 2 (emphasis added). So the FONSI's rejection of the No Action alternative on the ground that it would violate Savoy's lease rights is a product of dangerous circular reasoning, where the very decision to confer those rights assumed that no mining would occur.

The Forest Service's consideration of alternatives was also deficient because it impermissibly limited the range of alternatives to only those that would meet Savoy's project objectives, rather than alternatives that might better serve Forest Service goals. For example, the Forest Service never questioned Savoy's choice of bottom hole location within Savoy's lease. Because Savoy's leasehold is within old growth, the Forest Service is restricted to approving at most one bottom hole per 640 acres. However, the Forest Service did not require Savoy to present any information about the likely productivity of its preferred bottom hole. *See* EA, Ex. B at ¶ 40 ("There is no requirement that the operator provide information about the potential for natural gas reserves in the target formation.") Without this information, the Forest Service could not take into account "all possible approaches to a particular project (including abandonment of the project) which would alter the environmental impact and the cost-benefit balance." *See NRDC,* 502 F.2d at 853. The likely productivity of this bottom hole relative to other possible bottom holes within the leasehold is essential information in assessing the project's benefits, particularly when approval of the proposed project necessarily precludes other possibly beneficial alternatives.

The Forest Service's treatment of the No Action alternative cannot be considered a "hard look" within the meaning of NEPA. While it is clear that the cited regulations seek to encourage mining operations where appropriate, they do not conflict with nor otherwise exempt the Forest Service from the requirements of NEPA. The Forest Service's summary rejection of the No Action alternative must be considered arbitrary and capricious within the meaning of the APA.

## VI. Discussion of the National Forest Management Act claim

Although the magistrate judge did not decide the matter, the plaintiffs alleged that the defendants violated the National Forest Management Act, and the motions for summary judgment requested adjudication of that claim. Shortly after Judge Binder issued his report, the plaintiffs filed a motion for clarification asking this Court to "issue a decision" upon this count, as well as the plaintiffs' remaining count for violation of the Mineral Leasing Act. Because the underlying motions called for resolution of all counts, the Court will grant the motion for clarification and analyze *de novo* the issues raised in the motions for summary judgment on these counts.

The National Forest Management Act (NFMA) requires that the Forest Service create land management plans for each national forest. 16 U.S.C. § 1604. The Act's purpose is to "meet the multiple-use objectives of the national forest system," *Seattle Audubon Society v. Evans,* 952 F.2d 297, 299 (9th Cir.1991), while pursuing the "goal of sustaining social, economic, and ecological systems," *Ecology Cen-*

*ter, Inc. v. United States Forest Service,* 451 F.3d 1183, 1195 (10th Cir.2006). The management plans are to "identif[y] the resource management practices, the projected levels of production of goods and services, and the location where various types of resource management may occur." *Northwoods Wilderness Recovery, Inc. v. United States Forest Service,* 323 F.3d 405, 407 (6th Cir.2003).

"Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). If a "use, project, or activity is not consistent with the applicable plan," the regulations give the Forest Service three options:

(1) Modify the project or activity to make it consistent with the applicable plan components;

(2) Reject the proposal or terminate the project or activity, subject to valid existing rights; or

(3) Amend the plan contemporaneously with the approval of the project or activity so that it will be consistent with the plan as amended. The amendment may be limited to apply only to the project or activity.

36 C.F.R. § 219.8(e); *see also Colorado Off–Highway Vehic. Coal. v. United States Forest Service,* 357 F.3d 1130, 1132 (10th Cir.2004).

■■■ "[A]gency decisions allegedly violating NFMA ... are reviewed under the Administrative Procedure Act." *Native Ecosystems Council v. United States Forest Service,* 428 F.3d 1233, 1238 (9th Cir. 2005). Consequently, "[s]ubstantial deference is due to the Forest Service's interpretation of a Forest Plan." *Cherokee Forest Voices v. United States Forest Service,* 182 Fed.Appx. 488, 494 (6th Cir.2006).

■■■ The Forest Plan at issue in the present case is the Huron–Manistee Na-

tional Forest Land and Resource Management Plan (LRMP). The LRMP provides that "[w]here reasonable alternatives exist, surface-disturbing activities will take place outside of old growth." LRMP at IV–73. In addition, the LRMP states that the Semi-primitive Non-motorized (SPNM) area "will be characterized by a predominantly natural or natural-appearing environment," in keeping with the "desired future condition" of the area. *Id.* at IV–191. The LRMP also speaks to the goal of reducing road density through the elimination of unnecessary pathways:

Roads on National Forest lands were developed through the years for specific access needs and remain open even though the need for many of them has ceased. These nonessential roads are mostly primitive roads, often referred to as "two-tracks" .... General use of these roads continues, though nonessential, and creates environmental, aesthetic, wildlife, and recreational concerns. Closure of these nonessential roads is desirable to reduce erosion, noise, and access to certain areas to provide improved habitat for sensitive wildlife species and increased opportunities for semiprimitive recreation experiences.

. . .

The preferred management direction will emphasize road management throughout the Forests according to the desired management prescriptions. This will include closure of nonessential roads (those roads not needed to meet management objectives), which will result in a net reduction of 220 miles of roads (280 miles of roads closed and 60 miles of road construction) during decade 1, and reduction of 686 miles by the end of the fifth decade.

*Id.* at III–9–11.

On the other hand, the LRMP states that "[t]he Forest Service will ... encour-

age inventory and development of Federal minerals [and] respect private mineral rights," with the caveat that it "ensure operators take reasonable and prudent measures to prevent unnecessary disturbance to the surface." *Id.* at IV–73. Similarly, the LRMP provides that the Forest Service shall "[p]ermit surface-disturbing exploration in most areas, especially where there is a potential to discover minerals of compelling domestic significance." *Id.* at IV–87–88.

The plaintiffs allege that the decision to allow directional drilling is inconsistent with the LRMP because (1) the project would take place within old growth forest, and the Forest Service failed to show that there were no reasonable alternatives to that placement; (2) the Forest Service did not establish that the project would contribute to achievement of the desired future condition for the SPNM and old-growth areas; and (3) the present road density already exceeds the density prescribed by the LRMP, and the project would only aggravate that defect. Therefore, the plaintiffs assert, the Forest Service's approval of the project was arbitrary, capricious, and not in accordance with the law, and therefore must be rejected under the APA.

The Court cannot conclude that the Forest Service violated the standards set forth in the LRMP with respect to old growth issues because the LRMP does not contain a blanket prohibition on the disturbance of old growth forest. Rather, it directs the Forest Service to examine feasible alternatives to development in old growth areas and otherwise limit the disturbance of old growth. Although the Forest Service's shallow and cursory examination of alternatives is troubling, the evidence shows that the impact on old growth would not be significant. The project calls for the removal of a small fraction (0.099%) of South Branch old growth forest, which the Forest Service could fairly deem immaterial and not incongruous with the overall management plan. Therefore, the Forest Service did not act arbitrarily or capriciously in determining that the project, as modified, could go forward in a manner consistent with the LRMP.

Similarly, the plaintiffs have not established a violation of the NFMA through their allegation that the decision to authorize drilling is in tension with the "desired future condition" of the SPNM area. The forest plan contemplates preserving the "natural or natural-appearing environment" of the SPNM zone, LRMP at IV–191, but it does not create a hard-and-fast prohibition against industrial activities. The language on which the plaintiffs rely is explicitly aspirational, the future condition of the SPNM being "desired," not mandated. Likewise, the language is not absolute: "[t]he desired future condition of [SPNM] management areas will be characterized by a *predominately* natural or natural-appearing environment." *Ibid.* (emphasis added). More importantly, however, the overall context of the LRMP reveals that, although discouraged, low-level industrial activity may occur within SPNM areas under certain circumstances. In addition to the general language quoted above, *see, e.g., id.* at IV–73 ("The Forest Service will ... encourage inventory and development of Federal minerals [and] respect private mineral rights"), there is a specific section that deals with oil and mineral extraction in SPNM zones. It lists the following conditions: "[ ]A[ ) ] Production facilities are outside the area when practical[; ( ]B[ ) ] Flowlines follow the access road where practical[; ( ]C[ ) ] Needed pumps are run by electric motors or equipped to minimize noise[; and ( ]D[ ) ] On-site facilities are painted earth tone colors." *Id.* at IV–204. In the present case, the production facility would be

located outside of the SPNM area, the flowlines would follow roads (although some expansion would be needed), efforts would be taken to minimize the noise, and there has been no allegation that the facility would not be painted in earth tones. Because the project appears to coincide with the specific terms of the LRMP, the Forest Service did not act arbitrarily and capriciously under the NFMA.

 Finally, the plaintiffs have abandoned their claim concerning road density. It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment. *See Graham v. American Cyanamid Co.*, 350 F.3d 496, 506 (6th Cir.2003) (leaving undisturbed district court's conclusion that plaintiffs "had abandoned their fraud claim by failing to respond to American Cyanamid's summary judgment motion on the claim"); *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir.2003) ("[B]ecause Palmer failed to delineate his negligence claim in his district court brief in opposition to summary judgment ..., his negligence claim is deemed abandoned."); *Clark v. City of Dublin, Ohio*, 178 Fed.Appx. 522, 524 (6th Cir. 2006); *Conner v. Hardee's Food Sys., Inc.*, 65 Fed.Appx. 19, 24–25 (6th Cir.2003); *see also* Fed.R.Civ.P. 56(c); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989) (explaining that a party opposing a motion for summary judgment may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion). Here, the plaintiffs averred in their complaint that the defendants had violated the NFMA by approving a project that would contribute to road density, yet they never addressed this allegation at any other point in the proceedings. In their brief in support of their motion for summary judgment, the plaintiffs devoted approximately one page to their NFMA claim. However, their discussion was confined to the old growth and desired future condition issues, with not a word on the allegation of excessive road density. When the defendants moved for summary judgment shortly thereafter, they too gave short shrift to the NFMA claim. However, although the defendants did not mention the road density allegation, they clearly sought to extinguish the whole of the plaintiffs' claim under the Act. In a twenty-three page response to the defendants' motion, the plaintiffs discussed the NFMA in two short paragraphs; but again, they did not write a word about the road density issue. Nor did they discuss the issue in their motion for clarification. Because the plaintiffs have shown no inclination to proceed on this allegation in the face of a motion for summary judgment seeking its resolution, the Court finds that the claim has been abandoned.

The Court believes that the defendants are entitled to judgment in their favor on the plaintiffs' NFMA claim.

## VII. Discussion of the Mineral Leasing Act claim

Finally, the plaintiffs pleaded a claim for violation of the Mineral Leasing Act (MLA) (also unaddressed by Judge Binder). The MLA governs leases authorizing the extraction of minerals from federal land. *See Amoco Production Co. v. Watson*, 410 F.3d 722, 725 (D.C.Cir.2005). In passing the MLA, Congress "sought to promote the orderly development of oil and gas deposits in publicly owned lands of the United States." *Devon Energy Corp. v. United States*, 45 Fed.Cl. 519, 521 (1999). Before a company can extract minerals from federal lands, it must receive a lease from the Department of Interior (DOI). *Murphy Exploration and*

*Production Co. v. United States Dept. of the Interior,* 252 F.3d 473, 476 (D.C.Cir. 2001). However, the Secretary has broad "discretion to refuse to issue any lease at all on a given tract." *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Once a lease has been granted, regulations implementing the MLA provide:

> The authorized officer is authorized and directed to approve unitization, communitization, gas storage and other contractual agreements for Federal lands ... and to require that all operations be conducted in a manner which protects other natural resources and the environmental quality, protects life and property and results in the maximum ultimate recovery of oil and gas with minimum waste and with minimum adverse effect on the ultimate recovery of other mineral resources.... Before approving operations on leasehold, the authorized officer shall determine that the lease is in effect, that acceptable bond coverage has been provided and that the proposed plan of operations is sound both from a technical and environmental standpoint.

43 C.F.R. § 3161.2.

Case law interpreting the MLA generally, and section 3161.2 specifically, is sparse. At least one court has held that section 3161.2 "sets forth only a broad objective to be achieved" and "lack[s] the specificity and clarity necessary to support judicial action under [APA] § 706(1)." *Blancett v. U.S. Bureau of Land Management,* 2006 WL 696050, *8 (D.D.C. Mar. 20, 2006), *appeal dismissed,* 2007 WL 1125713 (D.C.Cir.2007). The court noted that the language was not defined by the Act or regulations, and is intended to vest the agency with discretion. *Ibid.*

 The plaintiffs alleged in their complaint that the defendants had violated the MLA by failing to comply with 43 C.F.R. § 3161.2 because they failed to ensure that the drilling project would be conducted in a manner that protected the environment and other natural resources. Further, the plaintiffs averred that the defendants had failed to ensure sufficient bond coverage and verify that the plan was sound from a technical and environmental standpoint. However, even assuming that the APA provides for review of a claim under section 3161.2, the plaintiffs have not alleged any facts that would establish a violation of this regulation independent of their NEPA claim. Rather, the plaintiffs seem to assume that they have established a violation of the MLA (by way of 43 C.F.R. § 3161.2) simply because they have shown a violation of NEPA. The plaintiffs have cited no authority for that proposition and the Court has found none. Nor do the statute or regulations suggest that the MLA is violated every time NEPA is breached in a mining case. The defendants are entitled to summary judgment on this claim as well.

## VIII. Conclusion

The Court agrees with Magistrate Judge Binder that the defendants' decision to issue a FONSI was arbitrary and capricious, although for slightly different reasons than those outlined in the magistrate judge's report. The Court also finds merit in the plaintiffs' request for clarification so that all its claims in the present dispositive motions are considered. The Court finds that the plaintiffs cannot prevail on their claims under the National Forest Management Act or the Mineral Leasing Act.

Accordingly, it is **ORDERED** that the plaintiffs' motion for clarification [dkt # 54] is **GRANTED**.

It is further **ORDERED** that the defendants' objections to the magistrate judge's report and recommendation [dkt # 56] are

SUSTAINED IN PART AND OVER-RULED IN PART.

It is further **ORDERED** that the report and recommendation [dkt # 51] is **ADOPTED IN PART.**

It is further **ORDERED** that the plaintiffs' motion for summary judgment [dkt # 30] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the defendants' motion for summary judgment [dkt # 34] is **GRANTED IN PART AND DENIED PART**

It is further **ORDERED** that the Decision Notice, Environmental Assessment, and Finding of No Significant Impact for the U.S.A. & South Branch 1–8 Well Project is **DECLARED INADEQUATE.**

It is further **ORDERED** that the defendants are **RESTRAINED AND ENJOINED** from using or relying upon and taking any action in reliance upon the Decision Notice, Environmental Assessment, and Finding of No Significant Impact for the U.S.A. & South Branch 1–8 Well Project.

It is further **ORDERED** that counts VII (violation of NFMA) and VIII (violation of MLA) of the amended complaint are **DISMISSED WITH PREJUDICE.**